# United States Court of Appeals
## For the First Circuit

No. 20-2169

JEAN CLEMENT MASHILINGI,

Petitioner,

v.

MERRICK B. GARLAND,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Selya, and Barron,
Circuit Judges.

Nicholas W. Armington, with whom Martha J. Koster, Mintz,
Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Elena Noureddine,
and PAIR Project were on brief, for petitioner.
James A. Hurley, Attorney, Office of Immigration Litigation,
Civil Division, United States Department of Justice, with whom
Brian M. Boynton, Acting Assistant Attorney General, and Stephen
J. Flynn, Assistant Director, Office of Immigration Litigation,
were on brief, for respondent.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General
Merrick B. Garland has been substituted for former Attorney General
William P. Barr as the respondent.

November 2, 2021

**SELYA**, **Circuit Judge**.  It is common ground that "a judicial officer who sees and hears a witness has a superior coign of vantage in assessing that witness's credibility." Zaruma-Guaman v. Wilkinson, 988 F.3d 1, 6 (1st Cir. 2021).  Given that superior coign of vantage, courts typically afford considerable deference to a trier's credibility determinations.  See, e.g., id. at 3; Rivera-Coca v. Lynch, 844 F.3d 374, 378-79 (1st Cir. 2016); Ahmed v. Holder, 765 F.3d 96, 100 (1st Cir. 2014); Mazariegos-Paiz v. Holder, 734 F.3d 57, 64 (1st Cir. 2013); Jianli Chen v. Holder, 703 F.3d 17, 21, 24 (1st Cir. 2012).  This case turns on just such a credibility determination — a credibility determination made at first hand by an immigration judge (IJ) and affirmed by the Board of Immigration Appeals (BIA).  Given that supportable credibility determination, we conclude that the Agency's denial of asylum and other relief was supported by substantial evidence on the record considered as a whole.  Accordingly, we uphold the order of removal and deny the petition for judicial review.

## I. BACKGROUND

We briefly rehearse the relevant facts and travel of the case.  In a visa application dated June 11, 2018, the petitioner, Jean Clement Mashilingi, a Rwandan national, requested permission to enter the United States and stay for a time in order (he claimed) to attend the wedding of his son.  Once the visitor's visa was granted, the petitioner entered the United States in August of

- 3 -

2018, with permission to stay up until the following February 7. On the final day of his authorized stay, the petitioner filed an application for protection (in the form of asylum) under the United Nations Convention Against Torture (CAT). In that asylum application, he claimed that he was kidnapped, beaten, and tortured by unknown men (whom he later learned were police officers) over several days beginning July 11, 2018. This incident, he said, was in retaliation for interviews he filmed for a local television station — interviews that concerned allegations that government officials were paying high-school girls for sex.

In March of 2019, the petitioner was detained by Immigration and Customs Enforcement (ICE) personnel. He was placed in ICE custody, and the Department of Homeland Security instituted removal proceedings against him on April 8. The petitioner conceded removability and cross-applied for asylum, withholding of removal, and CAT protection. For the most part, he reiterated his previous claims — but this time he alleged that he had immediately identified his assailants from the July 2018 incident as police officers.

The IJ held hearings on September 13 and November 4, 2019. The petitioner testified that he had been a cameraman for TV-10, a local television company in Rwanda, and had been assigned to collaborate with a journalist who was investigating increased pregnancies at local high schools. After some confusion about

- 4 -

dates, the petitioner eventually stated that this work had taken place in 2018. He went on to testify that he filmed interviews with two of the pregnant girls, each of whom alleged that government officials would visit their school to have sex with them and that the school covered up those meretricious activities.

The petitioner further testified that when he arrived home after the interview, he saw a police car parked across the street. Plainclothes police officers got out of the car and approached him. He was immediately able to identify the men as police officers because they came from the police car and had guns and handcuffs. The officers demanded the interview film, queried him about his identity, and abused him and his family both verbally and physically.

During the petitioner's testimony, there was some uncertainty about whether the petitioner had a key to his home and how he entered the dwelling. Some of this uncertainty arose because the petitioner testified to knocking on his front door, not to unlocking it.

The petitioner's testimony continued. He said that — following the altercation at his home — the men transported him to the police station. He was held there for three days while the men beat and tortured him and interrogated him regarding the whereabouts of the film. He claimed that the officers used screwdrivers, removed his thumbnail with pliers, and beat him about

the face with their guns.  According to the petitioner's account, he lost consciousness at some point and awoke in the hospital.  He was in bad shape:  he had swelling about his face, visible scarring, and lost and impacted teeth.  Although he was not certain as to how long he was at the hospital, he was certain that he was there "not less than five days."

In addition to the petitioner's testimony, both sides submitted documentary exhibits.  These exhibits included the petitioner's two applications for relief from removal, his visa application, statements from persons with knowledge of various events, expert reports, and country conditions reports.[1]  The exhibits did not include the records of the hospital stay that the petitioner described as following his alleged beating (which were never tendered).

On December 9, 2019, the IJ denied the petitioner's application for relief and ordered him removed to Rwanda.  The centerpiece of the IJ's written decision was an adverse credibility determination:  she found the petitioner's testimony not credible based on "numerous and significant inconsistencies between [the petitioner's] testimony and the documentary evidence, the

---

[1] Objections were raised by the parties concerning their inability to cross-examine the creators of some of these documents (including the visa application and the statements of the petitioner's children).  The IJ did not sustain these objections, but advised the parties that she would consider them in determining the weight to be given to specific documents.

implausibility of the timeline of [the petitioner's] account, and his responsiveness to the Court's questions." We summarize the inconsistencies:

- The petitioner testified that "the story he used to obtain a visa to come to the United States was fraudulent" — his son was not getting married. He added that his wife's cousin came up with the apocryphal tale and filled out the visa application for him. Yet, after ICE took him into custody, he told ICE officers that he made up the story — but he did not mention that his wife's cousin had played any role.

- The petitioner testified that he was "kidnapped on July 11, 2018, . . . detained for three days, and . . . was in the hospital for 'not less than five days.'" Yet, his interview for his visa application took place at the embassy on July 16, 2018 — a date which, "according to [his] timeline, . . . was three days before he was released from the hospital." To explain this inconsistency, the petitioner suggested that his injuries made it difficult for him to remember dates. The IJ rejected this suggestion, noting that the petitioner steadfastly

"insisted . . . that he was abducted on July 11, 2018."

- Even though the petitioner testified that he had applied for the visa after his abduction on July 11, 2018, "it was established . . . that [he] submitted his visa application June 14, 2018, almost one month prior to his alleged abduction." The IJ found the petitioner's explanation for this discrepancy unsatisfactory because that explanation did not "clarif[y] the timeline of events." Nor did it make sense for the petitioner to have sought a visa prior to his abduction; according to his testimony — "it was his abduction that prompted him to apply for a visa."

- The petitioner testified that the injury to his teeth was caused, in part, by his captors "hit[ting] him in the mouth with the butt of a gun." In contrast, a medical report introduced by the petitioner did not ascribe the damage to his teeth to being struck by the butt of a gun but, rather, stated that he told his doctor that these injuries were inflicted, at least in part, when he "was kicked in the face with a

- 8 -

heavy boot."[2]  The IJ found that the petitioner did not satisfactorily explain the inconsistency between his testimony and the medical report.

- The IJ found that the petitioner's answers were inconsistent and evasive with respect to whether stitches had been administered:  in his testimony, the petitioner equivocated about whether or not he had received stitches, and he did not explain why he had equivocated.

- The petitioner testified that he had his visa photo taken on July 17, 2018 — six days after he was abducted and a few days after he was allegedly beaten and tortured.  But the photos showed no facial injuries or disfiguration.  The IJ found it "implausible that the photo of [the petitioner] would not display significant trauma to [his] face," given that he "received such a severe beating that caused his teeth to be removed," was an inpatient for "'not less than five days' in the hospital immediately preceding his

---

[2] The medical report was not prepared contemporaneously with the petitioner's hospitalization but, rather, was prepared by a physician who examined the petitioner during the time — roughly a year later — when he was being detained in ICE custody.  With respect to the etiology of the claimed injuries, the report relies exclusively on the petitioner's recitation of events.

visa interview," and supposedly "received stitches above his left eye."

- The petitioner originally testified that he began working on the investigation that allegedly triggered his abduction in June 2017. He later testified that he had started working on the investigation in June of 2018. The IJ did not credit the petitioner's explanation that he had confused the starting date of the investigation with the starting date of his employment at the television station.

- When asked about the men who allegedly abducted him, the petitioner testified that "he could tell they were police because they had guns, batons, and handcuffs, and that he saw them exit the police car." This conflicted with his original asylum application, in which he stated that he did not know the identity of the men who abducted him and did not realize that they were police until later.

- The IJ found that the petitioner's answers were nonresponsive and evasive with respect to why he did not have a key to his own home.

- The petitioner testified that "he learned his wife was in the United States in December 2018," but both of his asylum applications — submitted after December

2018 — stated that "he left his wife in Rwanda and he did not know where she was." The IJ considered the petitioner's attempted explanations but found them unconvincing.

Although these inconsistencies vary in importance and degree, the IJ did not simply lump them all together. Instead, the IJ noted that, "while each of these inconsistencies taken alone may not be concerning," their cumulative effect was great. In her view, neither the petitioner's explanations for the inconsistencies nor his documentary proffers were sufficient to repair his damaged credibility. Nor were they sufficient to salvage his claims for relief.

The petitioner appealed the IJ's decision to the BIA. He contended — as relevant here — that the IJ's adverse credibility determination was clearly erroneous. In support, he argued that the listed inconsistencies were either "subject . . . to obvious explanation, or . . . the result of a misreading or misquotation of the record." He further argued that the IJ erred both by not giving due weight to corroborating evidence and by requiring him to provide additional corroboration that he could not reasonably obtain.

Unswayed by these arguments, the BIA upheld the IJ's adverse credibility determination, rejected the petitioner's other assignments of error, and affirmed the IJ's decision. Of

- 11 -

particular pertinence for present purposes, the BIA concluded that the adverse credibility determination was supported by "specific, cogent reasons based in the record."  This timely petition for judicial review followed.  In it, the petitioner maintains that his claims for asylum, withholding of removal, and CAT protection were erroneously denied.

## II. ANALYSIS

Where, as here, the BIA's decision rests primarily on the IJ's decision, we review both decisions as a unit.  See Zaruma-Guaman, 988 F.3d at 5.  For ease in exposition, we attribute the adverse credibility determination to the IJ (mindful, however, that the BIA unequivocally upheld that determination).

We start with the petitioner's claim for asylum.  To obtain that relief, he had to show, inter alia, that he was "unable or unwilling to return to his homeland on account of either past persecution or a well-founded fear of future persecution."  Id.  On this record, his own testimony is indispensable to that showing: without his testimony, there is no sufficient proof either of persecution or of a well-founded fear of persecution.  In the first instance, then, our inquiry focuses on the supportability of the IJ's adverse credibility determination.

An adverse credibility determination is, at bottom, a finding of fact. As such, it is subject to review (in immigration proceedings) under the substantial evidence standard.  See id.

- 12 -

This standard is deferential: "[a]s long as the agency's credibility determination is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole,' we must accept it." Id. (quoting Rivas-Mira v. Holder, 556 F.3d 1, 4 (1st Cir. 2009)). Put another way, "a reviewing court should leave such a [credibility] determination intact as long as the agency provides specific and cogent reasons for it." Ahmed, 765 F.3d at 100; see Weng v. Holder, 593 F.3d 66, 71-72 (1st Cir. 2010). "[A]bsent an error of law" — and we discern none here — "we will reverse only if the record is such as to compel a reasonable factfinder to reach a contrary determination." Zaruma-Guaman, 988 F.3d at 5 (quoting Chhay v. Mukasey, 540 F.3d 1, 5 (1st Cir. 2008)).

In making credibility determinations, an IJ must consider "the totality of the circumstances." 8 U.S.C. § 1158(b)(1)(B)(iii). Relevant factors include:

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy or

- 13 -

falsehood goes to the heart of the applicant's
claim, or any other relevant factor.

Id. An adverse credibility determination, appropriately reached,
may in itself suffice to defeat an alien's claim for asylum. See
Zaruma-Guaman, 988 F.3d at 5.

The petitioner argues that the IJ's adverse credibility
determination was based not on substantial evidence but, rather,
on "a selective and misconstrued reading of the record." The
inconsistencies identified by the IJ, he says, were either
insignificant or nonexistent. Each of them was either "subject to
obvious explanation, or result[ed] from a misreading or
misquotation of the record."

We think that the petitioner reads the record through
rose-colored glasses. The identified inconsistencies are real.[3]
And although some of them may be arguable, it was the proper
province of the IJ to resolve any uncertainty. When the facts
give rise to competing inferences, each of which is plausible, the
IJ's choice between those competing inferences cannot be found to

---

[3] To illustrate, we need look no further than the
inconsistencies regarding the timing and circumstances of the
petitioner's visa application. This application was dated nearly
a month before the incident that allegedly prompted him to flee.
He admitted — both in testimony and in a sworn affidavit — that
the story he used to gain admittance to the United States was
concocted. In addition, the time line of the petitioner's alleged
torture and recovery does not jibe with the time line of the visa-
application process: they overlap in incompatible ways, and the
visa photo does not show injuries consistent with the alleged
beating.

be unsupported by substantial evidence.  See Jiang v. Gonzales, 474 F.3d 25, 28 (1st Cir. 2007).

So, too, the bare fact that the petitioner offered explanations for the inconsistencies does not carry the day.  Part of the IJ's function, qua factfinder, is to sift wheat from chaff and assess the persuasive force of explanations that are offered for apparent inconsistencies.  See Zaruma-Guaman, 988 F.3d at 8. Here, the reasons given by the IJ for discounting the petitioner's explanations are plausible and, thus, supported by substantial evidence.

The petitioner also argues that some of the identified inconsistencies are trivial.  That argument, however, suggests that we should overlook the forest and focus instead on the individual trees.  But credibility determinations require a reviewing court to consider the record in its entirety.  See 8 U.S.C. § 1158(b)(1)(B)(iii); see also Zaruma-Guaman, 988 F.3d at 5.  The whole is frequently greater than the sum of the parts and — whatever may be said about any particular inconsistency if that inconsistency is viewed in splendid isolation — the record in this case, taken in its totality, strongly supports the IJ's adverse credibility determination.  Given the number of inconsistencies, their overall significance, and the weakness of the petitioner's explanations, it would stand logic on its head to say that the

record as a whole compels a conclusion that the IJ's adverse credibility determination was either arbitrary or unfounded.

The short of it is that the inconsistencies in the petitioner's testimony were specifically identified, well-documented, hard as a group to reconcile or explain, and cumulatively persuasive of a lack of credibility. Viewing them in the aggregate, a factfinder reasonably could conclude — as the IJ did — that the petitioner's testimony was unreliable and, thus, unworthy of belief. Consequently, the IJ's adverse credibility determination passes the substantial evidence test.

For the sake of completeness, we deal briefly with some of the petitioner's other arguments. To begin, he suggests that the IJ disregarded substantial corroborating evidence such as his children's statements, the medical report, and the report of an expert witness. This suggestion does not get him very far.

The petitioner's contention that the IJ erred in not attaching greater significance to his children's statements is easily dispatched. The IJ considered the children's statements but — as she promised she would do when the government objected to their admission, see supra note 1 — gave the statements "limited weight" because the children were not available for cross-examination. The IJ's assessment of these statements was reasonable and does not throw any shade on her adverse credibility determination. See Jianli Chen, 703 F.3d at 26 (discussing IJ's

- 16 -

prerogative to make determinations about which evidentiary documents — and which statements within them — should be given weight).

The petitioner next suggests that the medical report corroborated his claimed injuries. At best, the medical report was a mixed bag, and the IJ did refer explicitly to it in her decision. She was not obliged to dissect the report and discuss every statement in it. See, e.g., Sihotang v. Sessions, 900 F.3d 46, 51 (1st Cir. 2018). An IJ may "sift through relevant documents, determining which documents are persuasive and which statements within a particular document should be given weight." Jianli Chen, 703 F.3d at 26. And with respect to such triaging, a reviewing court should defer to the IJ's reasonable exercise of her judgment. See id.

Nor did the IJ (as the petitioner insists) overlook the expert witness's report.[4] Rather, she considered it but found it unreliable because it was based, in relevant part, on the petitioner's own statements. The IJ found the petitioner "not credible" and, thus, determined that any conclusions drawn by the expert from the petitioner's testimony were also "unreliable."

---

[4] The expert in question — Dr. Harry Verhoeven — is a political scientist. He had no personal knowledge regarding the petitioner's travails. Instead, he offered an opinion on the plausibility of the petitioner's account, from the vantage point of his (the expert's) knowledge of Rwandan country conditions.

This determination was reasonable: it is a common-sense proposition that the quality of an expert's opinions cannot be better than the quality of the information supplied to the expert.

Contrary to the petitioner's importunings, this determination was not a product of circular reasoning. Unlike in Vatyan v. Mukasey, 508 F.3d 1179 (9th Cir. 2007) — the decision relied upon by the petitioner — it is plain that the IJ's adverse credibility determination was the basis of, not the result of, her findings about the unreliability of the expert's report. There was no circularity in the IJ's reasoning.

The petitioner also suggests that the IJ violated his due process rights by premising the adverse credibility determination partly on unauthenticated evidence (his visa application). In support, he alleges that his visa application "was not subject to any authenticating testimony concerning the information it contained," that it "was not authenticated by an official publication," and that it was not "attested by the official having legal custody of the record." Thus, the petitioner's thesis runs, the admission into evidence of the visa application and the IJ's reliance on it were fundamentally unfair.

The petitioner's thesis rests on a faulty premise. There are no hard-and-fast rules for authenticating foreign public documents in immigration proceedings. See Yongo v. INS, 355 F.3d 27, 31 (1st Cir. 2004); see also Zaruma-Guaman, 988 F.3d at 7

(explaining that "[s]trict rules of evidence do not apply in immigration proceedings" (alteration in original) (quoting Jianli Chen, 703 F.3d at 23)). In such cases, "a petitioner's own testimony is a proper method that may be used to authenticate foreign public documents." Vatyan, 508 F.3d at 1185. So it is here: the petitioner's testimony authenticated the documents. We discern nothing about either the visa application's admission or the IJ's reliance on it that is antithetic to due process. See, e.g., Yongo, 355 F.3d at 30-31 (upholding admission and use of unauthenticated immigration documents as against due process challenge).

The petitioner's final plaint is that the IJ overstepped in requiring corroborating evidence that was not reasonably available to him. He submits that "before the failure to produce corroborating evidence can be held against an applicant, there must be explicit findings that (1) it was reasonable to expect the applicant to produce corroboration and (2) the applicant's failure to do so was not adequately explained." Seoung v. Holder, 677 F.3d 484, 488 (1st Cir. 2012).

This plaint is wide of the mark. In this case, the IJ did not require corroborating evidence[5] and did not hinge her

---

[5] Although the IJ noted that a statement from the petitioner's wife was "reasonably available and not provided," this comment was made in connection with her conclusion that the petitioner's

- 19 -

decision on the absence of such evidence. Instead, she quoted our statement in Ahmed, 765 F.3d at 101, that "the presence of corroboration may save an asylum application notwithstanding the alien's apparent lack of credibility." She then concluded that the corroborating documentation proffered by the petitioner was inadequate to accomplish that objective. In the IJ's words, the corroborating evidence proffered by the petitioner was "insufficient to support his claim of past persecution or a well-founded fear of future persecution."

To recapitulate, we find nothing amiss either with the IJ's adverse credibility determination or with the BIA's affirmance of that determination. Given the chasmal gap in the proof resulting from the lack of sufficient evidence of persecution (past or future), the denial of the petitioner's claim for asylum was supported by substantial evidence. See id.; Mazariegos-Paiz, 734 F.3d at 65.

Upholding the denial of the petitioner's asylum claim effectively ends our inquiry. Because the standard for withholding of removal is more stringent than that for asylum, the petitioner's counterpart claim for withholding of removal must likewise fail. See Rivera-Coca, 844 F.3d at 378 ("Thus, if the petitioner 'fails to establish a well-founded fear of persecution sufficient to

corroborating evidence was lackluster (not as support for the adverse credibility determination itself).

ground an asylum claim, a counterpart claim for withholding of removal . . . necessarily fails.'" (alteration in original) (quoting Amouri v. Holder, 572 F.3d 29, 35 (1st Cir. 2009))). Finally, the petitioner's CAT claim flounders for much the same reason as his asylum claim. To gain protection under the CAT, the petitioner had to prove that it was more likely than not that he would be tortured were he repatriated to Rwanda. Because the petitioner's proof in this regard rested mainly on his own testimony, the adverse credibility determination sinks that claim as well. See Mazariegos-Paiz, 734 F.3d at 65.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the petition for judicial review is denied.

**So Ordered**.