# United States Court of Appeals
## For the First Circuit

No. 23-2081

JOZELIA MARIA DE OLIVEIRA RODRIGUES; E.C.D.O.R.,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Chief Judge,
Thompson and Gelpí, Circuit Judges.

Lidice D. Samper and Samper Law on brief for petitioners.
Adriana Lafaille and Julian Bava on brief for the
American Civil Liberties Union Foundation of Massachusetts, Inc.,
amicus curiae.
Brian M. Boynton, Principal Deputy Assistant Attorney
General, Civil Division, Dawn S. Conrad, Senior Litigation
Counsel, Office of Immigration Litigation, and Christopher G.
Geiger, Trial Attorney, United States Department of Justice,
Office of Immigration Litigation, on brief for respondent.

August 8, 2024

**THOMPSON, Circuit Judge**.  An adverse credibility finding (or adverse credibility determination, as it is also commonly called) is a factual finding that a noncitizen's testimony during their removal proceedings was not credible.  We've repeatedly explained (and find ourselves in the position to reiterate today) that such a finding can defeat a noncitizen's claim for immigration relief.  See, e.g., Mashilingi v. Garland, 16 F.4th 971, 977 (1st Cir. 2021); Zaruma-Guaman v. Wilkinson, 988 F.3d 1, 5-6 (1st Cir. 2021).  Today's immigration appeal is a prime example of an adverse credibility finding doing just that.

To explain, at the center of today's immigration appeal we have Jozelia Maria De Oliveira Rodrigues ("De Oliveira") and her minor daughter E.C.D.O.R. (collectively, "Petitioners"), Brazilian citizens who fled to the United States after their neighbor, a drug dealer named Joao Carlos ("J.C."), began to threaten them.  Once here in the United States, they applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), but an Immigration Judge ("IJ") denied their applications primarily because she found De Oliveira's in-court testimony not credible.  Petitioners thereafter appealed to the Board of Immigration Appeals ("BIA" and, collectively with the IJ, "the agency"), which ultimately affirmed the IJ's adverse credibility finding.  Fearing what might happen to them if removed to Brazil, Petitioners appealed once

- 2 -

more and brought their case to us through a petition for review, urging us to reverse the agency's adverse credibility finding. For reasons we'll explain in due course, however, we find the adverse credibility finding is sufficiently supported by the record and, accordingly, we must deny the petition.

**GETTING UP TO SPEED**

As always, we begin by getting up to speed with a summary of the facts and of how Petitioners' case made its way to us. (Bear with us, as we do plunge into the particulars.) In laying out the facts and procedural history, we draw from the administrative record, including De Oliveira's testimony, which the IJ found not credible.[1] M.S.C. v. Garland, 85 F.4th 582, 585 n.2 (1st Cir. 2023).

*Credible Fear Interview*

On or about November 22, 2017, Petitioners entered the United States and applied for admission into the country. Upon arrival, De Oliveira expressed a fear of returning to Brazil so the Department of Homeland Security ("DHS") referred her to an asylum officer ("AO") for a credible fear interview ("CFI").[2] De

---

[1] The IJ made no credibility determination as to De Oliveira's minor daughter, E.C.D.O.R., because she did not testify. In fact, De Oliveira was the only witness to testify before the IJ.

[2] A CFI is a preliminary screening conducted by an AO to determine whether a noncitizen "can establish a credible fear of persecution or torture" in the country of removal. 8 C.F.R. § 208.30(d)-(e); see also 8 C.F.R. § 235.3(b)(4).

Oliveira's CFI took place over the course of two days, December 4 and December 6, 2017, with the help of a Portuguese interpreter. The AO took notes during the course of the interview, but those notes include the following disclaimer:

> The following notes are not a verbatim transcript of this interview. These notes are recorded to assist the individual officer in making a credible fear determination and the supervisory [AO] in reviewing the determination. There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening.

According to those notes, the AO started off the interview by gathering some basic personal information about De Oliveira, including that her last address in Brazil was in Santa Rita do Itueto. He also asked her several questions about her family, such as whether she was married and whether she had children. To the marriage question, De Oliveira responded that she was "[l]egally married but in real life [she was] not with [her] partner any[more]" and the "[l]ast time [she] heard of him he [was] in Brazil." To the children question, she responded that she had two children, E.C.D.O.R., who had entered the United States with her, and a son, who was still in Brazil.

With De Oliveira's basic personal information squared away, the AO shifted the focus of the interview to De Oliveira's fear of returning to Brazil. She explained that in Brazil she was threatened by three to five different "drug users" with weapons

- 4 -

near her house. This all started, De Oliveira went on, after she saw them "using and selling drugs" and "report[ed] them to the police." Although these individuals were arrested by the Brazilian police, they were soon released from custody and began threatening De Oliveira and her family. These individuals, De Oliveira explained, would "pass by [her] house and scratch the tip of [a] gun on [her] window."

The AO asked several follow-up questions to tease out if there were any other reasons these individuals (or anyone else) would harm De Oliveira if removed back to Brazil. For example, the AO asked her whether "being a member of [her] family" had "anything to do with" why these individuals targeted her. De Oliveira stated that she believed it did "[b]ecause [she] [no] longer live[d] with [her] husband, [she] live[d] alone with [her] daughter, being a single mother was easier for [her] to be targeted." The AO also asked her whether she had any problems in Brazil "because of [her] race, being indigenous." De Oliveira expressed that she "fe[lt] abused" in Brazil because "[w]hite people" would "call [her] bad names, that [she] came from the forest, the jungle." When asked who might harm her in Brazil because of her indigenous ethnicity, she responded "[p]eople from other race groups, people who like to despise indigenous people."

At the end of interview, the AO asked De Oliveira if the following summary of her testimony was correct:

> You testified that you were threatened by drug dealers in Brazil because you informed the police on them, . . . and you are a single mother. You fear that if you return to Brazil the gang members will kill you because of these same reasons . . . .

De Oliveira indicated that the AO's summary was correct. Nowhere in the interview notes does it reflect that De Oliveira ever specifically mentioned an individual by the name J.C. (we'll get to his relevance to De Oliveira's narrative shortly).

Ultimately, the AO deemed De Oliveira's fear credible and referred Petitioners to the immigration court for removal proceedings, during which they could seek asylum and related relief.

### *I-589 Applications and Written Affidavit*

Less than a year later on October 23, 2018, De Oliveira filed with the Boston Immigration Court her I-589 application for asylum, withholding of removal, and CAT protection, listing E.C.D.O.R. as a derivative.[3] To support their I-589 applications for asylum and related relief, Petitioners filed several additional documents, including a three-page written affidavit

---

[3] Two quick points. First, our use of "derivative" here refers to the fact that "[w]hen a noncitizen has been granted asylum, immigration law allows their spouse and children (who meet certain statutory criteria) to be granted asylum as derivatives." Cabrera v. Garland, 100 F.4th 312, 315 n.1 (1st Cir. 2024). That benefit applies only to asylum, not withholding of removal or CAT protection. Id. Second, in addition to being listed as a derivative on her mother's I-589 application, E.C.D.O.R. filed a separate I-589 application for herself, also on October 23, 2018.

from De Oliveira drafted with the help of Petitioners' lawyer, seven country conditions reports, a copy of De Oliveira's passport, and copies of E.C.D.O.R.'s and her brother's birth certificates.

One piece of supporting evidence worth getting into the weeds of is De Oliveira's written affidavit. In it, she stated that her neighbors in Brazil were having a loud party one night and she could see that they were drinking and doing drugs. Although she asked them to keep it down, they refused and "[e]ventually the police showed up and arrests were made [due] to the drug use." One of the arrestees was her neighbor J.C., who De Oliveira did not know at that time "was a well[-]know[n] drug dealer."

The day after the party, J.C. was released from police custody and began calling her house and threatening her family because J.C. believed she called the police on him, notwithstanding her denials to the contrary. Thereafter, J.C. frequently called De Oliveira, sometimes "yelling and screaming" at her, sometimes "just breath[ing] heavily into the phone," sometimes "calling [her] horrible names," and sometimes threatening "to rape [her]." Despite De Oliveira reporting J.C.'s threats to the police "multiple times," the police "did nothing to stop him."

In fact, things worsened. J.C. began showing up at De Oliveira's work to follow her home. She became so concerned that J.C. would do something to her on her way home that she had a

co-worker start walking her home. One day, J.C. slashed De Oliveira's tires and that night he called her to ask her if she liked having her tires slashed. She "pleaded with him to leave [her] and [her] family alone," but J.C. just "laughed and said that he was going to kill one of [her] children as punishment." This interaction really frightened De Oliveira so she packed up her family's things and "went to stay with one of [her] cousin[s]" in a different town. De Oliveira's efforts, it turns out, were all for naught because J.C. "found out where [they] were." This convinced her that J.C. "would continue to hunt [them] down there in Brazil," so she fled to the United States with E.C.D.O.R. in tow.

That was the extent of the information included in De Oliveira's written affidavit.

*Direct Examination*

Chugging along, on September 9, 2019, Petitioners appeared with their lawyer before the IJ for their merits hearing, seeking to avoid removal through their applications for asylum, withholding of removal, and CAT protection. At the hearing, De Oliveira took the stand, first for direct examination by her lawyer, through the help of a Portuguese interpreter.

After some preliminary biographical questions, De Oliveira's lawyer asked her why she came to the United States. She explained that she fled to the United States after J.C., her

- 8 -

neighbor and a drug trafficker, began threatening and harassing her three to four years ago. Those threats and harassment began, De Oliveira testified, after she saw him using drugs in front of her house and she called the police. Although the police came and arrested him, he was released the next day and he began threatening to kill her and her family and to set her house on fire. In addition to the threats, De Oliveira testified that J.C. slashed her tires, that "[t]here were nights where he spent the entire night with a revolver outside of [her] house," and that he would "follow [her], and bother [her] at night." De Oliveira went to the police for help, but "they didn't do anything." With no protection from the police, she decided to move to Belo Horizonte, "[a]nother state [in Brazil] where [they] had some relatives." J.C., however, found them in Belo Horizonte and threatened to kill De Oliveira and her children.

De Oliveira also mentioned, in response to her lawyer's questioning, that she was the descendant of Indians and, therefore, indigenous. She added on that J.C. "many times would cuss [her] out as an Indian and say, like, Indian is like a . . . jungle animal."

At the end of her direct examination, De Oliveira stated that she feared returning to Brazil because J.C. was a dangerous person capable of carrying out his threats, as she previously

"witnessed him . . . beat[ing people] up."  Since fleeing to the United States, however, she has not heard from him again.

*Cross-Examination*

Next up was the government's turn to cross-examine De Oliveira, during which she made some relevant clarifications to the issues on appeal today.

In response to the government's questioning, De Oliveira clarified that she contacted the police about J.C. three to four times in total; the first time for the loud party and drug use and the latter times for his threats against her and her family.  After the government asked De Oliveira why she had not submitted any Brazilian police reports about these incidents in support of Petitioners' applications for immigration relief, she testified that she did try to acquire these reports but, when she called the Brazilian police to get copies, they told her that they would only give them to her if she first paid them 10,000 Brazilian reals.[4]

De Oliveira also made some important clarifications about her family.  She testified that, at the time she called the police on J.C., she was living with her husband and their two children.  The four of them left Brazil together at the same time, but her husband and son entered the United States on November 18, 2017 and Petitioners entered four days later on November 22, 2017.

_____

[4] In today's dollars, that sum would be around $1,800.

- 10 -

When asked why her husband and son entered before her and E.C.D.O.R., De Oliveira explained her husband "came ahead of [her], because he was going to find a place to stay for when [she] arrived with [E.C.D.O.R.]." She further explained that her husband was presently in the United States. The government followed up and asked De Oliveira if she had asked her husband to submit a written statement corroborating her testimony, to which she responded, "No."

The next clarifications regarded the move to Belo Horizonte to escape J.C. and his threats. De Oliveira explained that Belo Horizonte was about a twenty-six-hour drive from her home in Santa Rita do Itueto, she lived at her cousins' home there for about a month, and her husband went there with her. She further testified on cross-examination that J.C. made his way to her cousins' home, told her that "he had found [her]," and threatened "that he was going kill [her] and [her] family and anybody that [she] got involved in the middle of it." J.C. didn't actually do so at that moment, De Oliveira went on, because her family and cousins were there. She also stated that she never informed her cousins about the threats she was receiving from J.C. or the real reason as to why she and her family went to live with them for a month. When her cousins asked De Oliveira who J.C. was after he approached her at their home, she simply told them he

- 11 -

"was just someone [she] knew" because she "w[as] afraid" and "didn't want to worry them."

Moving on, the government then asked De Oliveira if J.C. had ever gone to her parents' and siblings' home in Santa Rita do Itueto looking for her. De Oliveira testified that, after she came to the United States, J.C. had gone to their home and spoken with her brother Washington. When pressed by the government as to why she didn't have Washington submit a written statement explaining that J.C. had come by looking for her, she explained that it was "[o]ut of fear that [J.C.] would find out and then try to take [her] brother's life." De Oliveira believed J.C. capable of doing so because he previously "slash[ed] [Washington's] motorcycle tires trying to get at [her]" right after she "reported him" to the police.

Finally, the government asked De Oliveira about a few alleged discrepancies between her in-court testimony and the notes from her CFI. For example, the government asked her why she told the AO that she was "[l]egally married but in real life [she was] not with [her] partner any[more]" but testified that she, her husband, and their children were all living together in Brazil. De Oliveira explained that there was a "time frame" of "[o]ne or two months" during which her husband left their home to see if J.C.'s threats would "calm down." When the threats did not "calm down," she reunited with her husband in Belo Horizonte at his

- 12 -

cousins' home, where he had been staying during this one-to-two-months' time frame. The government quickly followed up and asked, "So when you went to live with your cousins it was your husband's cousins," to which De Oliveira responded, "Yes."

The government also asked De Oliveira if she knew J.C.'s name when she came to the United States, to which she indicated that she did. If that was the case, the government followed up by asking why she didn't mention J.C.'s name during her CFI. De Oliveira responded with the following: "If I didn't say it, it was due to forgetting because I had -- as far as I know, I had said it." Furthermore, the government asked De Oliveira why, throughout her CFI, she referred to people plural threatening her, as her in-court testimony suggested only J.C. had threatened her. She explained that J.C.'s "subordinates" "were always by [his] side."

After a bit more back and forth questioning, the government ended its cross-examination.

*IJ's Questioning*

After cross-examination there was no re-direct or re-cross, but the IJ did take an opportunity to ask De Oliveira some clarifying questions of her own.

Recounting just the highlights, the IJ asked De Oliveira why she had not mentioned Washington's tires being slashed in her I-589 application or written affidavit, to which she responded, "I

don't know."  Next, the IJ inquired as to whether De Oliveira had ever asked the co-worker who would sometimes walk her home from work to write a letter corroborating her story.  She responded that she had not done so.  The IJ also asked her why she hadn't listed the Belo Horizonte address in her I-589 application.[5]  De Oliveira explained that she had "stayed there for a very short amount of time, and [she] didn't even make note of and remember the address where [she] stayed."  Notably, the IJ also asked De Oliveira why her written affidavit prepared with the help of her lawyer did not include any mention of the confrontation between her and J.C. in Belo Horizonte.  De Oliveira stated that "when [she] was talking with [her] attorney [she] was bringing up the things that were . . . happening more frequently, and that was just something that happened more, like, at a distance, so [she] didn't put that down."  Then, the IJ asked De Oliveira why her written affidavit indicated that it was her cousins' home that they stayed at in Belo Horizonte, whereas she testified on cross-examination that it was her husband's cousins.  She clarified that she "consider[s] them [her] cousins because they're [her] husband's relatives."  Finally, the IJ asked De Oliveira if anyone had ever hurt her children.  She indicated that J.C.'s son

---

[5] Among the many questions listed on the I-589 applications Petitioners submitted are questions regarding their last address before coming to the United States and their addresses for the past five years.

frequently hit her son at school.  After the IJ asked her why she didn't include this detail in her I-589 application or written affidavit,[6] De Oliveira explained it was her understanding that her "case [was her] and [E.C.D.O.R.]" and didn't understand the I-589 application to be asking her about instances of harm to the rest of her family.

That was the end of the IJ's questioning.  Before ending the hearing, the IJ indicated that she would be issuing a written decision and previewed, with some elaboration, that her decision would be a denial because she did not find De Oliveira's testimony "to be very credible."

*The IJ's Decision*

The IJ was true to her word and issued a written decision on September 24, 2019, denying Petitioners asylum, withholding of removal, and CAT protection and ordering their removal to Brazil. She denied them relief for the most part because of an adverse credibility finding but she concluded, in the alternative, that they would not be entitled to relief on the merits regardless.

Starting off with asylum, the IJ found that De Oliveira "did not testify credibly due to the inconsistencies between her written statement and her testimony before the court and her sworn

_____

[6] Another question included on the I-589 applications Petitioners submitted is whether "you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone."  (Emphasis added).

- 15 -

statements to the . . . [AO] who conducted an interview, and due to significant omissions from her written statement." To support the adverse credibility finding, the IJ laid out nine alleged inconsistencies, which we recap below:

- De Oliveira testified that J.C. stood outside of her house with a revolver, but her written affidavit made no mention of this.

- De Oliveira's testimony reflected that the family internally relocated within Brazil to her husband's cousins' home in Belo Horizonte, whereas her written affidavit reflected that it was her cousins.

- While De Oliveira testified that J.C. actually made his way to her husband's cousins' home in Belo Horizonte and confronted and threatened her there, her written affidavit was silent as to this alleged confrontation. The IJ also commented that she found it "highly implausible that [J.C.] would have followed her to this house, but not physically harmed anyone there."

- De Oliveira's CFI notes and I-589 application indicated that her most recent address in Brazil was in Santa Rita do Itueto, but she testified that she lived in Belo Horizonte before fleeing Brazil and did not include this address in her I-589 application.

- De Oliveira testified that J.C. used to call her ethnic slurs because of her indigenous ethnicity, but neither her written affidavit nor the CFI notes reflected her ever mentioning her ethnicity as a motivating factor behind J.C.'s threats. While the IJ noted that De Oliveira told the AO that she feared harm on account of being indigenous, when asked by the AO who would harm her, she only responded "[p]eople from other race

- 16 -

groups, people who like to despise indigenous people."

- De Oliveira told the AO that she was targeted because she was a single woman who no longer lived with her husband and that she was "[l]egally married but in real life [she was] not with [her] partner any[more]." To the IJ, however, this statement was "most troubling" as it "was a far cry from the truth." The IJ explained that, based upon De Oliveira's testimony, De Oliveira, her husband, and both of their children "left Brazil together, entered Mexico together, only split apart to enter the United States, and reunited once within the United States." The IJ further noted that De Oliveira had "repeatedly told the [AO] that she was living alone with just her daughter."

- De Oliveira testified that her son had been threatened, but omitted any mention of this detail during her CFI.

- De Oliveira never mentioned J.C. by name to the AO; rather, she told the AO that she was threatened near her house by drug users who she saw using and selling drugs. Along these same lines, the IJ noted that De Oliveira's written affidavit explained that she did not know J.C. was a drug dealer before she called the police.

- De Oliveira never mentioned Washington's tires being slashed in her CFI, I-589 application, or written affidavit. The IJ further expressed that De Oliveira's explanation for not including that information was not "reasonable."

While these inconsistencies individually may not have raised concerns, the IJ explained, their cumulative effect casted doubt on the credibility of Petitioners' entire claim. "Based on the inconsistencies combined with [De Oliveira's] demeanor and

unresponsiveness to questions,"[7] the IJ went on, "further corroborating evidence regarding the past harm [De Oliveira] allegedly suffered or her fear of future harm" would be required to support Petitioners' claims. Aside from "generalized country conditions information," the IJ lamented, Petitioners had offered no other corroborating evidence. For example, De Oliveira had not provided police reports from the Brazilian authorities, claiming that the police demanded she first pay 10,000 Brazilian reals. The IJ highlighted that De Oliveira did not provide that explanation until specifically asked, and the omission of that explanation from her written affidavit was "striking," "given that her claim [was] hinged upon her assertion that the police will do nothing to assist her from the threats." Moreover, the IJ noted that De Oliveira did not provide any corroborating written statements or testimony from her co-worker, her brother Washington, her husband's cousins, or, "[m]ost significantly, her husband" who "is in the United States."

In sum, the IJ denied Petitioners asylum because De Oliveira "did not present credible testimony, and further that she ha[d] not adequately corroborated her claim with reasonably obtainable evidence, and thus ha[d] not met her statutory burden of proof for asylum." Having denied asylum, the IJ also denied

---

[7] The IJ did not provide any specific examples of De Oliveira's demeanor or alleged unresponsiveness.

withholding of removal, because it has an even higher standard of proof than asylum.[8]  As for CAT protection, the IJ denied that form of relief too because De Oliveira had not demonstrated that J.C. would subject her to harm that amounted to torture, nor had she demonstrated that the Brazilian government would acquiesce to her torture given the fact that the police already arrested him once at her insistence.

A timely appeal to the BIA followed.

*The BIA's Decision*

The BIA dismissed Petitioners' appeal on December 7, 2023, upholding the IJ's adverse credibility finding.  In its decision, the BIA adopted and deferred to the IJ's factual findings, including the adverse credibility finding, because the IJ "articulated specific, cogent reasons based in the record for finding that [De Oliveira] was not credible."  In reaching that decision, the BIA highlighted the same inconsistencies outlined by the IJ in her decision.[9]  The BIA also agreed with the IJ that

---

[8] In addition, the IJ concluded that, in the alternative and assuming De Oliveira had testified credibly, Petitioners' asylum and withholding of removal claims would still fail because they had not demonstrated past persecution or a well-founded fear of future persecution on account of a protected ground.  For those immigration-law beginners, don't fret as we'll explain what this all means in just a few pages.

[9] It's worth noting, though, that the BIA did not mention the following two inconsistencies that the IJ highlighted in her decision:  (1) the discrepancy about whether it was De Oliveira's or her husband's cousins' home that they stayed at in Belo

Petitioners did not submit corroborating evidence, such as police reports or statements from De Oliveira's brother, her husband's cousins, or her husband himself. Accordingly, the BIA affirmed the adverse credibility finding and the denial of asylum and withholding of removal.[10] Finally, as to CAT protection, the BIA noted that Petitioners had not challenged the IJ's denial of that form of relief.

A timely appeal to us followed next and that gets us all the way to present day.

**OUR TAKE**

Now up to speed on the facts and procedural history, we turn our attention to our take on Petitioners' appellate arguments and there's a few things that are clear right out of the gate.

First, Petitioners' brief challenges only the agency's denial of asylum and withholding of removal and does not "challenge the BIA's determination to deem waived the issue of CAT protection." Caz v. Garland, 84 F.4th 22, 30 n.7 (1st Cir. 2023). "So, to the extent [they] wished to challenge that determination,

_____

Horizonte, and (2) the omission in her I-589 application and written affidavit that her son had been threatened.

[10] Because the adverse credibility finding was outcome-determinative of Petitioners' asylum and withholding of removal claims, the BIA declined to address the IJ's alternative conclusions that Petitioners had not suffered past persecution or articulated a well-founded fear of future persecution on account of a protected ground.

- 20 -

any arguments [they] had to that effect are waived," id., and that will be our last mention of anything on the CAT-protection front. Second, as to asylum and withholding of removal, Petitioners argue that the agency not only erred as to its adverse credibility finding, but also that the IJ erred as to her alternative conclusion that Petitioners had not shown past persecution or a well-founded fear of future persecution on account of a protected ground. As explained above, however, the BIA expressly declined to address the IJ's alternative findings and rested its decisions solely on the adverse credibility finding. And where the BIA does not address "an IJ's alternative ground for denying relief, that ground is not before us." Bonilla v. Mukasey, 539 F.3d 72, 81-82 (1st Cir. 2008). Accordingly, the claims before us are Petitioners' challenge to the agency's denial of asylum and withholding of removal vis-à-vis only the adverse credibility finding, which we turn to now, kicking things off with asylum.

*Asylum*

A noncitizen is granted asylum only if they prove they are a "refugee," which is defined, in relevant part, as a person unable or unwilling to return to their home country "because of [past] persecution or a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Immigration law provides that a noncitizen's

"testimony . . . may be sufficient to sustain [this] burden without corroboration, but only if the [noncitizen] satisfies the trier of fact that the [noncitizen's] testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the [noncitizen] is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). In this way, therefore, a noncitizen's credible testimony can make their asylum claim, while an adverse credibility finding can break it. That is so because, if the agency makes such a finding, "that determination strips the testimony of probative force and permits the agency to disregard or discount it." Segran v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007). And once a noncitizen's testimony has been deemed not credible, "[a] failure either to provide readily available corroborating evidence or to offer a compelling explanation for such a failure" can be the straw that breaks the camel's back. Rivera-Coca v. Lynch, 844 F.3d 374, 379 (1st Cir. 2016).

Additionally, part of the reason why an adverse credibility finding "can prove fatal" to an asylum claim, Pan v. Gonzales, 489 F.3d 80, 86 (1st Cir. 2007), is the standard under which we review such findings. As a factual finding, adverse credibility findings are reviewed under the deferential substantial evidence standard. Diaz Ortiz v. Garland, 23 F.4th 1, 14 (1st Cir. 2022). While this standard of review is certainly not toothless, see Kartasheva v. Holder, 582 F.3d 96, 105 (1st

Cir. 2009), "[t]he extent to which this standard is deferential bears emphasis," Zaruma-Guaman, 988 F.3d at 5. Reversal is appropriate "only if the record is such as to compel a reasonable factfinder to reach a contrary determination." Mashilingi, 16 F.4th at 977 (citation omitted). Such deference is afforded to adverse credibility findings because the IJ has a front-row seat at the merits hearing and is, therefore, uniquely situated to take stock of a witness's credibility and demeanor, as opposed to appellate courts, like ourselves, reviewing a cold record from the nosebleeds. See Mam v. Holder, 566 F.3d 280, 283 (1st Cir. 2009).

All that said, not every adverse credibility finding gets a judicial stamp of approval. See Segran, 511 F.3d at 5. Indeed, "[w]e will not accord deference . . . to the agency's findings or conclusions that 'are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole, or are merely personal views of the [agency].'" M.S.C., 85 F.4th at 594 (quoting Cordero-Trejo v. I.N.S., 40 F.3d 482, 487 (1st Cir. 1994)). Rather, adverse credibility findings will only be upheld if they are supported by the record and the agency "has given reasoned consideration to the evidence and has provided a cogent explanation for [its] finding." Cuesta-Rojas v. Garland, 991 F.3d 266, 270 (1st Cir. 2021) (quoting Huang v. Holder, 620 F.3d 33, 37 (1st Cir. 2010)). And Congress has

outlined a litany of factors the agency can rely on in assessing credibility:

> [T]he demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii).

Here, in adopting and affirming the adverse credibility finding, the BIA "relied largely on the IJ's decision," discussing in its own decision seven of the nine inconsistencies articulated by the IJ. Zaruma-Guaman, 988 F.3d at 5. As such, we review "the BIA's decision and the IJ's decision as a unit." Id. At the outset, we note that the highlighted inconsistencies are plain as day and Petitioners seem to agree because they repeatedly concede in their briefing that some inconsistencies between De Oliveira's statements, both written and oral, do exist. Despite these multiple concessions, Petitioners offer two main comebacks. First, they argue that the discrepancies cited by the agency "are either not supported by the record or [De Oliveira] provided a

- 24 -

convincing explanation for the discrepancies." Second, they argue that "[a]ny omissions in [De Oliveira's] testimonies are insufficient to call into question the entirety of [Petitioners'] claim." Neither argument withstands scrutiny.

Starting off with their first argument, in contending that the discrepancies cited by the agency are not supported by the record, Petitioners spill ink discussing only two discrepancies: (1) whether De Oliveira was a single mother (which, to remind, was the discrepancy the IJ found "most troubling" and "a far cry from the truth"), and (2) whether she knew J.C. was a drug dealer when she called the police on him.[11] As to whether De Oliveira was a single mother, the inconsistency is readily apparent from the record. On the one hand, she told the AO that she was "[l]egally married but in real life [she was] not with [her] partner any[more]"; that the "[l]ast time [she] heard of him he [was] in Brazil"; and that she no "longer live[d] with [her] husband, [she] live[d] alone with [her] daughter, being a single mother was easier for [her] to be targeted." On the other hand, she testified that she and her husband lived together in Brazil at the time she called the police on J.C.; he was threatened by J.C.

[11] Petitioners do spill some ink (two sentences, to be exact) on another discrepancy -- namely, whether it was De Oliveira's husband's cousins, as opposed to her cousins, with whom the family stayed in Belo Horizonte -- but the BIA did not get into this discrepancy in its decision, so neither do we.

too; he moved away only for one to two months, not because of any marital strife, but in hopes J.C. would stop threatening them; she met up with her husband at his cousins' home in Belo Horizonte; they left Brazil together;[12] and her husband and son entered the United States a few days before her and E.C.D.O.R. "to find a place to stay for when [she] arrived with [E.C.D.O.R.]." These statements are irreconcilably at odds with each other so we need not dwell.[13]

As to whether De Oliveira knew J.C. was a drug dealer when she reported him to the police, the record reflects that, during her CFI, De Oliveira told the AO that she called the police

---

[12] To be specific, De Oliveira testified that she, her husband, and their two children left Brazil together. Consequently, this testimony was not just inconsistent with the CFI notes in the sense that she told the AO that her husband was in Brazil, but she also told the AO that their son was still in Brazil, which was also untrue.

[13] Petitioners take exception with the IJ's statement that De Oliveira and her husband "left Brazil together, entered Mexico together, only split apart to enter the United States, and reunited once within the United States" because there is supposedly nothing in the record to indicate they entered Mexico together, "only" split apart to enter the United States, or that they reunited in the United States. That, however, is not an accurate representation of the record. De Oliveira testified that the only reason they didn't enter the United States together was because her husband "was going to find a place to stay for when [she] arrived with [E.C.D.O.R.]" (which, contrary to Petitioners' contention, reasonably implies they traveled to the United States together and were planning on reuniting once the place to stay was found) and Petitioners' I-589 applications reflect that De Oliveira remains married to her husband and De Oliveira, her husband, and their two children all live in Massachusetts.

on J.C. and his subordinates and they began threatening her because she "saw them using and selling drugs." In her written affidavit, however, she stated explicitly that "[a]t the time [she reported J.C. to the police she] didn't know that [her] neighbor was a well[-]know[n] drug dealer." While these two statements appear inconsistent, Petitioners argue any discrepancy can easily be explained away because her written affidavit can be understood to be saying De Oliveira knew J.C. was a drug dealer when she reported him, but didn't know he was a well-known drug dealer. In other words, "well-known" is, in Petitioners' view, the operative word in De Oliveira's written affidavit. Setting aside the fact that the written affidavit places no emphasis on that word, we've explained before that "[w]hen the facts give rise to competing inferences, each of which is plausible, the IJ's choice between those competing inferences cannot be found to be unsupported by substantial evidence." Mashilingi, 16 F.4th at 978. And here, the agency reasonably read De Oliveira's written affidavit to say she did not know J.C. was a drug dealer when she reported him, which was contrary to her statement to the AO. Accordingly, both these discrepancies are reasonably supported by the record and the agency properly relied on them in supporting its adverse credibility finding.[14]

_____

[14] Petitioners make a passing argument that neither of these discrepancies can support the agency's adverse credibility finding

Next in line for our consideration is Petitioners' second argument, which (to refresh) is that any omissions "are insufficient to call into question the entirety of" Petitioners' claims. In their briefing, they make arguments only about certain omissions highlighted by the agency, namely, that De Oliveira did not mention (1) J.C.'s use of indigenous slurs in her CFI, I-589 application, or written affidavit; (2) J.C.'s name during her CFI; (3) her son being threatened in her CFI, I-589 application, or written affidavit; (4) the confrontation between her and J.C. in Belo Horizonte in her CFI, I-589 application, or written affidavit; and (5) Washington's tires being slashed in her CFI, I-589 application, or written affidavit. To Petitioners, these omissions cannot support the agency's adverse credibility finding for three reasons. None persuade.

First, Petitioners argue that where De Oliveira's testimonies "consistently describe the presence or absence of persecution," omissions cannot doom her asylum claim. For example, they note that De Oliveira testified consistently "about the nature of the threats she received, how J.C. followed her, and he slashed her tires." But again, we're aware of no authority (and

because they did "not involve any fraudulent documents" and De Oliveira "remained consistent about the timeline of her victimization." But Petitioners cite no authority (and we are aware of none) that suggests an adverse credibility finding is only proper when the noncitizen submits fraudulent documents or is inconsistent about the timeline of victimization.

- 28 -

Petitioners point us to none) that suggests omissions cannot support an adverse credibility finding where certain other parts of a noncitizen's story remain consistent. Second, Petitioners argue that the agency unreasonably relied on omissions in the CFI, despite the CFI notes' explicit disclaimer that they are not a verbatim transcript and certain aspects of a noncitizen's claim might not have been explored. It is true that we have recognized that an agency may err when it "fails to treat the notes as the sketch that they represent themselves to be." Cuesta-Rojas, 991 F.3d at 273. But even on that score, these omissions were not just absent from the CFI notes, but also from the I-589 applications and De Oliveira's written affidavit, which, we highlight, were prepared with the benefit of counsel's guidance. Third, Petitioners argue that these omissions were either too "insignificant" or "tangential" to the harm they endured to call into question their claims. In making this argument, however, Petitioners seem to be turning a blind eye to Congress' instruction that the agency can base its adverse credibility determination on "any inaccuracies or falsehoods . . . without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). It also seems to ignore our instruction that, "whatever may be said about any particular inconsistency if that inconsistency is viewed in splendid isolation," "credibility determinations require a

reviewing court to consider the record in its entirety," so "[t]he whole is frequently greater than the sum of the parts." Mashilingi, 16 F.4th at 978.[15]

Ultimately, the bottom line is that the agency highlighted a smorgasbord of inconsistencies, which "were specifically identified, well-documented, hard as a group to reconcile or explain,[16] and cumulatively persuasive of a lack of credibility." Id. Under these circumstances, the agency was well within its discretion to require further corroborative evidence. See Avelar Gonzalez v. Whittaker, 908 F.3d 820, 827 (1st Cir. 2018). The agency was also well within its rights to hold against Petitioners the failure to provide, aside from seven generalized country conditions reports, any corroborative evidence such as

---

[15] We also dispute the characterization that some of these omissions could be considered "insignificant" or "tangential." Take, for example, the omission of the confrontation between De Oliveira and J.C. in Belo Horizonte. Where immigration law provides that asylum can "be denied if the adjudicator determines that [the noncitizen] could avoid persecution by internally relocating within the country of removal and, under all the circumstances, it would be reasonable to do so," Caz, 84 F.4th at 27, we do not see how Petitioners' persecutor traveling to "[a]nother state" in Brazil, which was a "26[-]hour[]" drive from Santa Rita do Itueto, to threaten De Oliveira and tell her "he was going to kill [her], [and] kill [her] children" could be reasonably viewed as "insignificant" or "tangential."

[16] Indeed, some of De Oliveira's explanations for these inconsistencies did little to help her cause. For example, when asked by the IJ why she didn't mention Washington's tires being slashed in her I-589 application or written affidavit, De Oliveira merely responded, "I don't know."

police reports or statements from De Oliveira's co-worker, brother, husband, or husband's cousins. Petitioners respond that it would have been unreasonable to require her to produce the Brazilian police reports given "the widespread levels of police corruption" and the fact that the Brazilian police demanded that she pay them 10,000 Brazilian reals before giving her the reports. But the absence of the police reports was not what the agency found most "striking"; rather, the agency expressed its disbelief that De Oliveira did not mention this "police misconduct . . . within the body of her written application and statement," "given that her claim [wa]s hinged upon her assertion that the police will do nothing to assist her from the threats." Petitioners also fault the agency for seemingly requiring live, in-court testimony from De Oliveira's husband when immigration law imposes no such requirement on spouses of noncitizens, but the BIA explicitly noted that he could have also provided a written affidavit, given that he is in the United States and lives in Massachusetts.

To tie it all together, viewing the inconsistencies as a whole, a reasonable factfinder could determine that De Oliveira's testimony wasn't believable. And with no supporting evidence to corroborate her otherwise incredible testimony, there was a dearth of proof that Petitioners satisfied immigration law's definition of a "refugee." In other words, the adverse credibility finding

was supported by substantial evidence and the agency's denial of asylum was proper.

*Withholding of Removal*

Comparatively speaking, there's much less for us to write to dispose of Petitioners' withholding of removal claim, as opposed to their asylum claim. Because Petitioners' burden is heavier as to withholding of removal than as to asylum,[17] Cabrera, 100 F.4th at 324, our resolution of Petitioners' asylum claim brings their withholding-of-removal house of cards tumbling down too, see, e.g., Mashilingi, 16 F.4th at 980; Avelar Gonzalez, 908 F.3d at 828.

*Loose Thread*

With the finish line in sight, we have one loose thread to address before we end. The American Civil Liberties Union of Massachusetts, Inc. ("ACLUM") filed an *amicus curiae*[18] brief in this case regarding some clarifications to our caselaw it hopes we

---

[17] Whereas a noncitizen applying for asylum need only show a "reasonable possibility" of persecution in the country of removal, which includes possibilities as low as "10%," I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987) (citation omitted), a noncitizen applying for withholding of removal must show "it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to [a] country," 8 C.F.R. § 1208.16(b)(2).

[18] Subbing out the Latin in favor of everyday English, "amicus curiae" refers to a party who "assist[s] the court on matters of law" through briefing and, sometimes, oral argument. Banerjee v. Bd. of Trs., 648 F.2d 61, 65 n.9 (1st Cir. 1981).

make in today's decision. In its brief, the ACLUM argues that we should take today's case as an opportunity to (1) "abandon, or at the least articulate limits to, the discredited *falsus in uno*, *falsus in omnibus* maxim,"[19] and (2) "further clarify that mere omissions are not inconsistencies." We, however, decline both invitations because "[t]he customary praxis in this circuit is to eschew arguments raised only by amici and not by the parties," Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 33 n.10 (1st Cir. 2020), and here neither party raised either issue.[20]

## CONCLUSION

As the IJ expressed in her decision, "[i]f what [De Oliveira] testified to did in fact occur, the Court by no means condones the reprehensible actions of [J.C.]," but, for the reasons articulated above, we must deny the petition.

---

[19] To set aside the Latin lingo once more in favor of everyday English, *falsus in uno*, *falsus in omnibus* means "false in one thing, false in everything." Quezada-Caraballo v. Lynch, 841 F.3d 32, 33 (1st Cir. 2016). That maxim provides that, when a witness lies about one thing, their entire testimony can be deemed false. See Castañeda-Castillo v. Gonzales, 488 F.3d 17, 23 (1st Cir. 2007).

[20] Indeed, Petitioners explicitly note in their brief that "the IJ did not make a *falsus in uno*, *falsus in [omnibus]* inference." And nowhere do they suggest an omission cannot, nor should not, be considered an inconsistency that can support an adverse credibility finding.