# United States Court of Appeals
## For the First Circuit

No. 25-1045

WILLIAM HERNANDO USMA ACOSTA,

Petitioner,

v.

TODD BLANCHE, Acting United States Attorney General,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Gelpí, Thompson, and Montecalvo,
Circuit Judges.

Todd C. Pomerleau, with whom Jeffrey B. Rubin and Rubin Pomerleau PC, were on brief, for petitioner.

Alexa Perlmutter, Trial Attorney, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, with whom Brett A. Shumate, Assistant Attorney General, U.S. Department of Justice, Leslie McKay, Assistant Director, U.S. Department of Justice, and Thankful T. Vanderstar, Senior Trial Attorney, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, were on brief, for respondent.

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting United States Attorney General Todd Blanche is automatically substituted for former United States Attorney General Pamela J. Bondi.

May 1, 2026

**THOMPSON**, **Circuit Judge**.    Carlos Alberto Rendón Castañeda ("Rendón") left his homeland of Colombia and entered the United States in the 1990s.  For nearly thirty years, he lived a typical American life.  He married an American citizen, bought a home, paid his taxes, and raised a son who graduated from college.  And in 2020, at his son's encouragement, Rendón began the culmination of his "American Dream" journey thus far -- his application to naturalize as a United States citizen.

One part of the naturalization process is a routine fingerprint check.  But for Rendón, that check turned out to be anything but routine.  Instead of speeding his journey towards citizenship, it uncovered a harrowing secret: Rendón was not actually Rendón, but really William Hernando Usma Acosta ("Acosta"), today's petitioner.[1]

And Acosta was far from the normal suburban dad who Rendón purported to be.  After shooting his first wife and his daughter in Colombia in 1994 -- killing the former and severely injuring the latter -- Acosta absconded to the United States and assumed the alias of Rendón, successfully evading the authorities' detection for almost three decades.  While Acosta lived here (as Rendón), a trial was held in Colombia where he (in absentia) was convicted of aggravated murder, among other charges.  And it turned

---

[1] Both Acosta's attorney and the government refer to him as Acosta, so we'll follow their lead in doing so.

- 3 -

out that Acosta's fingerprint scan connected him to an "INTERPOL Red Notice" -- close to, but not exactly, an international warrant -- seeking Acosta's extradition to Colombia to be punished for those crimes.

The Department of Homeland Security arrested Acosta in 2022, commencing a series of proceedings resulting in his removal to Colombia. He asks us to review the decisions of the immigration judge ("IJ") and the Board of Immigration Appeals ("BIA") leading to his removal.[2] After carefully considering all his arguments, we deny most and dismiss the remainder for lack of jurisdiction. Read on to see why.

**FACTS**

**A**

We'll start with Acosta's origin story.[3] He grew up in La Estrella, what he described as a "mid-sized town" in Antioquia, one of Colombia's thirty-two administrative departments (which are similar to states or provinces). He was the oldest of his parents'

---

[2] Per our usual practice, we'll call these institutions "the Agency" when referring to them collectively. See, e.g., Cabrera v. Garland, 100 F.4th 312, 315 (1st Cir. 2024).

[3] We draw our facts from testimony and documents found throughout the administrative record. See Penafiel-Peralta v. Garland, 115 F.4th 1, 3 & n.3 (1st Cir. 2024). Credibility of some testimony is, as the reader will learn, disputed; we note as needed where that matters.

six children and the only boy.  At thirteen, his father left the family, so Acosta began working to support his mother and sisters.

As a teenager, Acosta met Laura Rosa Agudelo Taborda. They soon began to date, but (at least in Acosta's view) Laura's family complicated things.[4]  Her mother and her brother Héctor in particular "did not accept" Acosta because he "grew up relatively poor and from a working-class family" (Acosta's words).  Yet Acosta and Laura married and had two children, Jennyfer first and then Cristian.  Those days, Acosta worked as a waiter for one stint and a taxicab driver for another.

Héctor made his money in a different way: the drug trade. Seeing that Acosta was struggling to make ends meet in the cab industry, Héctor wanted to get him involved in the family business. Acosta says he always refused.

But Laura didn't.  After Héctor bought Acosta and Laura a house, she began to spend more time working with her brother, and Acosta says she became involved in his drug-trafficking operations, handling the financials.  That became a sticking point in their relationship, and Acosta says he left Laura because he refused to enter the drug trade.[5]  Yet Jennyfer -- to remind,

---

[4] Where necessary, we use first names.  We intend no disrespect in doing so, and we only use them for clarity.

[5] One night in particular seemed to be the straw that broke the camel's back.  In Acosta's telling, Laura sent him to pick up a package from the airport (delivered under Héctor's girlfriend's name) and deliver it to a local gym.  Upon arriving at the gym

Acosta and Laura's daughter -- recounts the marital breakup differently: she says Acosta physically and sexually abused Laura until Laura eventually forced him out.

Either way, once Acosta left Laura, he moved in with his mother and then began seeing another woman named Sonia. Though that spousal separation split the family, Acosta usually spent Saturday nights and Sundays with Jennyfer and Cristian.

**B**

It was on one of those Saturday nights in June 1994 that things took a fatal turn. Acosta drove to Laura's house to pick up Cristian and Jennyfer, but Jennyfer (now at least eleven years old) decided to stay with her mother instead.[6] Acosta then drove away with Cristian and his small overnight bag. A few minutes into the drive, though, Cristian mentioned he didn't have his bottle and blanket for the night, so Acosta turned around.

Disputes abound about the precise details of what happened next, and we will describe those disputes in detail later.

---

with the box in hand, Acosta soon found himself held at gunpoint and forced into a car, where he quickly forked over the package; he was then kept captive in a parking lot until a man (we don't know who) was satisfied that sufficient cash was in the package. Once he got home, Acosta told Laura he had no interest in being involved in Héctor's underworldly doings.

[6] We say "at least eleven years old" because the record isn't consistent on whether Jennyfer was eleven or thirteen at the time.

But a few things are clear and necessary for understanding the rest of the case.

Upon their return to Laura's house, shots were fired towards Acosta and Cristian. The two fled, but Acosta returned to the house later to retrieve Jennyfer.[7] When he did, tensions flared, and he wound up shooting both Laura and Jennyfer before fleeing the scene. (He later offered variant reasons for why he discharged his weapon, "warning shots" gone astray being one and self-defense being a second.) Laura succumbed to her wounds, but Jennyfer survived.

## C

Acosta quickly went into hiding. He worried that Laura's family, particularly Héctor, would come after him using their drug trafficking ties. So, through his mother's cousin, Acosta purchased a false ID in the name of "Carlos Alberto Rendón Castañeda," a process that involved taking a photo and some fingerprints.

Leaving his old life behind, Acosta flew from Colombia to Aruba, then to St. Martin, and finally to Puerto Rico. When he got off the plane in Puerto Rico, he was rushed to a car and held in a "clandestine location" (his words) for roughly five days; he

---

[7] It's unclear whether Acosta returned once or twice, but to keep the narrative moving, we just note that dispute and set it aside (as promised above).

later boarded another plane to New York.  Finally, he traveled from New York to Massachusetts.

And that was where he would stay for decades.  He began to build a new life for himself under his alias of Carlos Rendón, where he, by all accounts, industriously worked as a handyman, painter, and plumber.  He started dating Hilandia Neuta in 1997, and they married in 1998.  Then came a son named Carlos (who bore his father's alias as his name).  Years passed by, and at least once, Hilandia and Carlos visited Acosta's family in Colombia, while Acosta stayed home.[8]  Carlos grew up and graduated from the prestigious Massachusetts College of Pharmacy and Health Sciences, becoming a nurse.

By now, the reader might be wondering how Acosta pulled all this off from an immigration-law perspective.  Let us explain. Acosta says he entered the United States on May 5, 1995.  In 1998, after he married Hilandia, he used his false credentials to successfully apply to change his immigration status to that of a conditional lawful permanent resident.  And in 2002, he became simply a legal permanent resident, sans conditions.  (Readers might know this status more colloquially as possessing a "green card."[9])

---

[8] Another dispute worth noting: whether Hilandia knew about Rendón's past life when she visited his family in Colombia.

[9] See Doe v. Noem, No. 1:25-cv-10495-IT, 2026 WL 184883, at *15 n.13 (D. Mass. Jan. 25, 2026).

Then, in 2020, Carlos insisted Acosta apply to naturalize as a citizen -- surely not understanding how the process would unfold for his father.

### D

We'll take a pause on Acosta's story and fill the reader in on happenings in Colombia since his 1994 dramatic escape.

After the shooting, Jennyfer -- who, remember, was about eleven years old when her father shot her -- "became a drug addict" and lived "on the streets for a long time" (her words). Eventually, she sought out "Bienestar Familiar," the Colombian Institute of Family Welfare, who sent her to a rehab facility.[10] The record then goes silent about what she did in the years between her exit from the rehab facility and the soon-to-be-described legal proceedings.[11]

Meanwhile, the Seventh Criminal Court of the District of Medellín (Antioquia) convicted Acosta in absentia of the aggravated homicide of Laura, the attempted aggravated homicide of

---

[10] Apparently, Acosta and Jennyfer once spoke over the phone a couple of years after the shooting, where (in Jennyfer's retelling) he justified his actions by saying to her that if he "hadn't killed [Laura], [what] would have been the future of [Jennyfer] and [Cristian]?"

[11] It's also unclear what precisely happened with Cristian during this time, though some evidence suggests he went to live with Acosta's mother. It appears Acosta helped provide for him from the United States and maintained some contact with him over the years.

Jennyfer, and illegal carrying of weapons of personal defense. Acosta's conviction eventually went out as an INTERPOL Red Notice,[12] signaling to law enforcement worldwide that he was a fugitive from justice whom Colombia sought to serve his sentence.

**E**

So we turn back to the United States and Acosta, who at this point still lived in the Boston suburbs (Belmont, to be specific). He followed Carlos's wishes and submitted his naturalization application under the Rendón alias in February 2020. We note a couple important details from the application: Acosta listed as a prior spouse only "Sonia Heredia" (the woman he says he moved in with after he and Laura split) and as his children only his two sons, Cristian and Carlos. Conspicuously absent (at least in hindsight) was any mention of his first wife Laura or his daughter Jennyfer.

Soon after, Acosta had his fingerprints taken. Upon analyzing his prints in its review of Acosta's application, the United States Citizenship and Immigration Services discovered his

---

[12] "INTERPOL" is short for "International Criminal Police Organization." Hernandez Lara v. Barr, 962 F.3d 45, 48 (1st Cir. 2020) (cleaned up). As we've elsewhere explained, "an INTERPOL Red Notice is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action." Id. at 48 n.3 (cleaned up). More on this later.

- 10 -

true identity via a complex cross-referencing fingerprint analysis.

Two years later, as Acosta's citizenship application sat pending, Immigration and Customs Enforcement agents suddenly appeared at his workplace on April 13, 2022, to arrest him. Acosta was then charged with removability under 8 U.S.C. § 1227(a)(1)(A).[13] His deportable offenses? The government alleged he procured his legal permanent resident (green card) status by fraud and willful misrepresentation of material facts -- specifically, both his false identity of "Carlos Rendón" and his failure to disclose his past marriage to Sonia in his earlier immigration applications. (And the government later amended the factual basis for its allegations, charging Acosta more broadly with failing to disclose his "prior marriage(s),"

---

[13] Two things. First, the Immigration and Nationality Act ("INA") says that a noncitizen "who at the time of entry or adjustment of status was within one or more of the classes of [noncitizens] inadmissible by the law existing at such time is deportable." 8 U.S.C. § 1227(a)(1)(A). Among those "inadmissible" classes of noncitizens are those who (as the government alleges Acosta did) procured their immigration status by fraud or willful misrepresentation of material facts. See 8 U.S.C. § 1182(a)(6)(C)(i).

And second, immigration courts sometimes cite to the section numbering of the INA as enacted, rather than sections of the United States Code. For instance, the IJ in this case cited "INA § 101(a)(42)(A)" for the definition of a refugee, which corresponds to 8 U.S.C. § 1101(a)(42)(A). We will stick to the codified version of the statute for clarity. See Clemente Props., Inc. v. Pierluisi-Urrutia, 165 F.4th 1, 12 (1st Cir. 2026) (doing the same for the Lanham Act).

- 11 -

i.e., leaving room for the possibility of more than one non-disclosed marriage.)

## PRIMER

Thus began a series of motions, hearings, decisions, and appeals. But given the "quirkiness of immigration law in the United States, before getting into what the IJ and the BIA had to say" about Acosta's case, "it will be helpful to provide a brief primer on the relevant legal principles and general statutory scheme for context." Samayoa v. Bondi, 146 F.4th 128, 133-34 (1st Cir. 2025) (cleaned up).

## Proceedings

If a noncitizen present in the United States is alleged "to have violated our immigration laws, an IJ may hold a hearing and find that individual removable from the country." Id. at 134. But, importantly, if the IJ finds the noncitizen removable, that "does not necessarily end the immigration process for that individual." Id. Instead, "Congress has created several avenues of discretionary relief for removable noncitizens which allow such persons to remain legally in the United States." Id. The following avenues of relief are relevant to today's case: application for asylum; statutory withholding of removal; protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (or just

simply, the "CAT"); waiver of inadmissibility; and cancellation of removal. (We'll say a bit about each in a moment.)

Yet, and as relevant here, even if the IJ denies any applications for relief the first time, the noncitizen can move to reopen proceedings, too, so long as they can present new material evidence that wasn't available during the first hearing (subject to some time and numerical limits, of course). See 8 C.F.R. § 1003.23(b)(1), (3). Still, this motion is a "disfavored tool, given the threat it poses to finality." Mazariegos v. Lynch, 790 F.3d 280, 285 (1st Cir. 2015). (More on that later.)

During this whole process, "the IJ has the front-line duty of finding the facts," which, if substantial record evidence supports the findings, will not be disturbed on appeal to the BIA absent a clear error. Adeyanju v. Garland, 27 F.4th 25, 33 (1st Cir. 2022) (cleaned up). And "clear error" is no low bar: to find it on a fact question, the BIA "must be left with the definite and firm conviction" that a factual mistake has been made; it isn't enough that the BIA might "have weighed the evidence differently or decided the facts differently had it been the factfinder." Id. (cleaned up). Put another way, the challenger "must show that the contested finding stinks like a [five]-week-old, unrefrigerated, dead fish." Id. (cleaned up). In contrast, questions of law generally remain available for the BIA's de novo review. Id.

## Asylum

Our primer now turns to the modes of relief Acosta invoked to prevent removal. First, asylum. Asylum is available to a noncitizen who qualifies as a "refugee" under the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1158(b)(1)(A). And a refugee, in turn, has a lengthy definition, but is essentially a noncitizen who cannot return to their country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A); see id. § 1158(b)(1)(A) (incorporating that definition). Yet there are several mandatory prohibitions on asylum, including that asylum isn't available for a noncitizen if "there are serious reasons for believing that the [noncitizen] has committed a serious nonpolitical crime outside the United States prior to the arrival of the [noncitizen] in the United States." Id. § 1158(b)(2)(A)(iii).

## Statutory Withholding of Removal

Second, statutory withholding of removal. A noncitizen can have their removal halted under the INA if their "life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1231(b)(3)(A). The requisite showing for withholding of removal

is similar to, but higher than, asylum.  See, e.g., Gomes v. Garland, 17 F.4th 210, 212 (1st Cir. 2021) (reciting the "more likely than not" standard) (cleaned up).  And, like asylum, a noncitizen is ineligible for withholding of removal if "there are serious reasons to believe" that the noncitizen "committed a serious nonpolitical crime outside the United States" before they arrived here, among other reasons.  8 U.S.C. § 1231(b)(3)(B)(iii).

**CAT Protection**

Third, protection under the CAT.  Generally, this comes in two forms: withholding of removal (which is functionally the same as statutory withholding) and deferral of removal.[14]  Either way, "CAT relief requires the applicant to prove that it is more likely than not that he will be tortured if returned to his home country."  Mazariegos, 790 F.3d at 287; see 8 C.F.R. § 208.16(c)(2).  "Specific objective evidence" is the touchstone here.  Mazariegos, 790 F.3d at 287 (cleaned up).  But if the "serious-nonpolitical-crime" bar (that we twice just noted) applies to a petitioner, then their "only remaining remedy" under the CAT "is deferral (as distinct from withholding) of removal." Morgan v. Garland, 120 F.4th 913, 927 (1st Cir. 2024).

---

[14] One key distinction between withholding and deferral is "the ease in which the deferral may be terminated," because "the regulations provide a streamlined termination process for deferral" compared to withholding.  Turkson v. Holder, 667 F.3d 523, 525 n.1 (4th Cir. 2012).

- 15 -

## Waiver of Inadmissibility

Fourth, waiver of inadmissibility. The INA establishes that certain noncitizens whose removability hinges on past fraud or misrepresentations which rendered them inadmissible when admitted to the United States may, in some circumstances, be granted a waiver of that inadmissibility determination. See 8 U.S.C. § 1227(a)(1)(H). For their waiver to be approved, they must satisfy several wordy statutory factors (that we needn't detail today). See id. But even if a noncitizen satisfies those statutory prerequisites, the final decision to waive inadmissibility is ultimately "in the discretion of the Attorney General" (and the IJ acting on the AG's behalf).[15] Id.

## Cancellation of Removal

Finally, cancellation of removal. A noncitizen's removal can be cancelled if the noncitizen has been "lawfully admitted for permanent residence for not less than [five] years," has "resided in the United States continuously for [seven] years after having been admitted in any status," and "has not been convicted of any aggravated felony." Id. § 1229b(a). But much like a waiver of inadmissibility, even if a noncitizen "satisfies these three prerequisites, the Attorney General's decision to

___

[15] Like removal generally, "the Attorney General has delegated to immigration judges the ability to grant relief from removal." Patel v. Garland, 596 U.S. 328, 332 (2022).

grant such relief is discretionary" and thus "amounts to an act of grace." Cabrera v. Lynch, 805 F.3d 391, 394 (1st Cir. 2015) (cleaned up).

## PROCEDURE

Our immigration-law vocabulary stocked, we turn now to Acosta's case.

## A

First, Acosta, during removal proceedings before the IJ occurring intermittently over several days, denied the charges -- living under a false name and failing to disclose prior marriages -- and their factual underpinnings.[16] So the government (figuratively) threw a pile of papers at him: fingerprint comparisons, an INTERPOL report, his past immigration applications (filed under the name Carlos Rendón), and documents from his Colombian prosecution. After hearing Acosta's attorney about the documents, and after Acosta conceded that he had been living under a false name, the IJ found Acosta removable on both factual grounds that the government alleged.

Acosta then applied for the batch of removal-preventing mechanisms we just described: asylum, withholding of removal, protection under the CAT, waiver of inadmissibility, and

---

[16] The IJ held nine hearings in total related to Acosta's case. We won't detail them all but instead just summarize the procedural history as necessary.

- 17 -

cancellation of removal. And in response to the government's stack of papers, he soon fired back with his own plethora of docs (over 650 pages' worth of evidence). That stack included social media posts of Laura's family threatening him; police documents from Colombia in 1994; declarations from him, his immediate family, his neighbors in Boston, and his sisters in Colombia; tax returns; and information about the Colombian cartel.

Acosta also testified in support of his applications for relief at a series of hearings. We highlight some noteworthy moments. Acosta spoke about the night of the fatal shooting in 1994, as well as the fear he felt because Laura's "narcotics trafficker" brother (and his cartel connections) would come for Acosta if he were deported. Yet Acosta also explained that, since he came to the United States, neither he nor any members of his family had faced threats in Colombia or by persons in Colombia. The government in return offered more evidence about the night of the shooting, including declarations from other witnesses. In an especially dramatic moment, it brought out Jennyfer to testify against her father about that fateful night nearly thirty years ago.[17]

---

[17] Along with testifying about abuse she and Laura suffered at Acosta's hands, Jennyfer provided an eyewitness account of the shooting and the fallout. In particular, she described how Acosta pulled up in his taxicab, shot Laura, shot Jennyfer, and then drove away.

During a separate intermittent hearing considering Acosta's remedial requests, he spoke in support of his application for cancellation of removal. He explained the hardships his family here would suffer if he were deported. And, on a different topic, he said (1) he didn't list Laura on his applications so he "wouldn't be tied to like a relationship" with her, (2) he just listed Sonia "to fill out that darn application," and (3) yes, he used "a name that wasn't mine" on every work and tax form he submitted while in the United States. Also testifying in support of Acosta's efforts to avoid removal was Hilandia, who described a good family life with Acosta and the hardships she'd face if he were deported.

**B**

Having considered all that evidence, the IJ issued his final decision in May 2023.[18]

---

[18] A bit of in-the-weeds procedural history. The IJ issued a decision in October 2022 finding Acosta removable and denying him all the remedies he sought. The first decision was substantially similar to the final decision we're about to describe. But both parties appealed the initial decision, and the BIA remanded it to the IJ. The BIA identified four issues that needed to be addressed on remand:

(1) The IJ should explain what findings of fact (which had to be supported by "evidence that was clear and convincing") established removability, and the IJ should explain "which allegations the respondent concedes and denies."

(2) The IJ should apply First Circuit law, rather than Fourth Circuit law.

- 19 -

The IJ first detailed the factual allegations supporting Acosta's removability. For one, the IJ explained that Acosta "procured" his immigration status "by fraud or willfully misrepresenting a material fact," namely his identity. To support that finding, the IJ relied on a fingerprint report, as well as some of Acosta's paperwork. For instance, Acosta's application for adjustment of status stated his name was Carlos A. Rendón and his date of birth was July 4, 1960, and that application was signed under penalty of perjury of law; meanwhile, his applications for asylum and withholding of removal stated that his name is William Hernando Usma Acosta and his date of birth is August 1, 1960. Finally, Acosta admitted in court that his name is Acosta.

Second, the IJ explained that Acosta "procured" his immigration status "by fraud or willfully misrepresenting" another "material fact," his marital history. On his naturalization

---

 (3) Operating under First Circuit law, the IJ was obliged to "reassess the credibility" of the witnesses and "address any inconsistencies or omissions" within Jennyfer's testimony.

 (4) And given the remand to reassess credibility, the IJ should take another look at Acosta's claim for protection under the CAT as well.

To conclude, the BIA explained, "After providing a more complete removability finding and applying the law of the First Circuit," the IJ "may reinstate his decisions with regard to these claims, or issue new decisions." But only the IJ's final May 2023 decision (thereafter affirmed by the BIA) is properly before us today, so we'll key in on that one.

application, he said he was married twice, listing Hilandia and Sonia. Yet he hadn't listed Sonia on his original immigration documents applying for an adjustment of status to become a legal permanent resident. And, separately, during his remedy hearings, he admitted he did not want his name to be connected to Laura's murder, and the Colombian courts had found that "the victim" Laura was "the spouse of the convict" Acosta, further evidence of their marriage. So the IJ found that Acosta omitted not one, but two marriages, when he sought an adjustment of his immigration status.

Finding Acosta removable, the IJ turned to the relief he sought. The IJ began by considering the testifying witnesses' credibility. First, the IJ found Acosta's credibility, particularly about the shooting of Laura and Jennyfer back in 1994, severely lacking. Along with other inconsistencies he saw in the record, the IJ gave a list of discrepancies in Acosta's several recountings of that calamitous night:

- Which persons at Laura's house had a gun?

- Of the many guns fired during the incident, who fired what?

- Who was on the porch with Laura?

- Was there a party at Laura's house?

- Where was Laura when Acosta arrived?

- Did Acosta return to the house once or twice?

- 21 -

- Did Acosta arrive there on foot or in his car?

According to the IJ, Acosta's long-ago police reports, his declaration, his direct examination, and his cross-examination yielded an inconsistent smorgasbord of answers to these questions (and others). So the IJ found Acosta not credible and discounted his testimony entirely.

Hilandia didn't fare any better. The IJ found her "evasive" and "lack[ing] persuasiveness." For one, he didn't buy Hilandia's claim that she didn't know Acosta was secretly posing as Rendón for more than two decades. After all, she knew about Cristian (Acosta's first son) and visited him in Colombia at least once, and she also met (and even stayed with) Acosta's mother. So, in the IJ's words, it was "highly incredible that in the twenty-five years of knowing her husband, knowing his son who lived in [Colombia] the entire time with [Acosta's] family, and knowing his family, not one person referred to" Acosta "by his real name or made some other reference to his past." And when pressed, Hilandia came across as "often vague" and gave "non-plausible responses." Similarly unconvincing to the IJ was Hilandia's purported ignorance of Jennyfer. So Hilandia's testimony was deemed not credible, too.

Meanwhile, as the IJ saw it, Jennyfer was "candid, responsive, and internally consistent," and her testimony "was further supported by sufficient corroboration." Gaps or

shortcomings in her testimony could be easily chalked up to the circumstances, the IJ thought: she was eleven years old when the violence unfolded, surely traumatized by her father's killing of her mother right in front of her, and -- perhaps most importantly -- also shot that night. Still, the IJ (following the BIA's remand order) walked through some inconsistencies in her testimony, largely related to statements she made through the investigation. Yet the IJ determined she was credible in light of the circumstances, so he would credit her testimony.

The IJ then moved into a discussion of the remedies Acosta sought, first considering asylum and withholding of removal. Based on the INTERPOL Red Notice, the testimony he heard, and other documents before him, the IJ found that there were "serious reasons" for believing Acosta murdered Laura in 1994. That constituted a "serious nonpolitical crime," rendering Acosta ineligible for asylum as well as withholding of removal under both the INA and the CAT. Deferral of removal under the CAT also wasn't warranted because Acosta failed to show how it "is more likely than not he would be tortured in Colombia by, at the instigation of, or with the acquiescence of" the government.

Next, the IJ denied Acosta a waiver of inadmissibility under 8 U.S.C. § 1227(a)(1)(H). The IJ explained that he "need not make a statutory determination" about whether Acosta qualified for the waiver because he would "nevertheless deny" the application

"based on a discretionary determination" of balancing the equities. Favoring Acosta in the balancing calculus were his family roots and long residency in the United States, the potential hardship to his family if he were deported, his employment history, and supportive letters from friends and family. Weighing against Acosta were his long-standing identity fraud -- which, in turn, led to decades of perjuries on immigration status applications, tax returns, healthcare forms, a mortgage, and the like -- and, of course, his Colombian convictions. All told, the adverse factors outweighed the positive equities, so the IJ explained that "a favorable exercise of discretion is not in the best interest of the United States," and Acosta's request for a waiver was denied "as a matter of discretion."

The IJ then denied Acosta's application for cancellation of removal, again looking past the statutory prerequisites and denying it based on the same discretionary balancing. All the remedies Acosta sought were thus denied.

C

Acosta next filed a motion to reopen the case. He made several arguments below but now pursues only one before us, so we'll just focus on telling the reader about that one.

Attached to his motion was a joint affidavit from two of his sisters, which he said "addresses several issues the Court had regarding both [Acosta's] and his wife's credibility." Although

his sisters had previously provided "very short statements" during the initial proceedings, they "feared saying or doing more than that at the time" due to fear of persecution by Jennyfer or the cartel.[19] They said Hilandia truly didn't know about Acosta's sordid past, and they provided their perspective on the night Laura was shot. (They weren't at the shooting, but instead at Acosta's mother's house, where he returned at least once during the night.) And Acosta's sisters went after Jennyfer's character, too, saying that she works "as a scammer" who does witchcraft and thus can't be trusted. Finally, they explained that they "firmly believe that [Acosta] will be killed if he is forced to return to Colombia," because of Laura's family's connections to the cartel.

The IJ refused to reopen the case. The sisters' proffered reason for not testifying more during the first proceeding wasn't plausible in the IJ's view because it did "not explain why it is now safer for both sisters to testify." And, anyway, the sisters' account of the shooting actually conflicted with evidence Acosta himself already put in the record, so it couldn't bolster his credibility. While the sisters said Acosta came to their mother's home with Cristian, didn't say anything (except for telling one of the sisters to take care of Cristian), and left Cristian there, Acosta's affidavit describes a

_____

[19] Both sisters had previously written brief, notarized letters to the IJ, vouching for Acosta's character.

conversation with his mother and his retrieval of a revolver. All told, the affidavit "would not impact the Court's previous findings," and Acosta hadn't shown why it was "material or . . . previously unavailable" (as he must for a successful motion to reopen) so the IJ declined to reopen proceedings.

## D

Acosta appealed to the BIA, but it affirmed the IJ's decisions across the board. It also rejected a new due process claim of judicial bias Acosta had levied against the IJ on appeal. (More on the BIA's reasoning as to all these questions later.)

## E

Following the BIA's decision, Acosta moved for this court to stay (in plainer terms, pause) his removal while we considered his petition for review. We denied the stay because Acosta hadn't made the necessary "strong showing that he is likely to succeed on the merits" of his petition. Nken v. Holder, 556 U.S. 418, 434 (2009) (cleaned up). So he was removed from the United States and sent back to Colombia. As far as we can tell, he was promptly arrested upon his arrival and soon began serving his twenty-eight-year prison sentence.[20] Even so, his petition remains live for us to consider, and that's what we'll now do.

---

[20] See Jenny Carolina González Camacho, Colombian fugitive living 30 years in Mass. deported after deadly secret uncovered, MassLive (June 11, 2025), https://www.masslive.com/news/2025/06/colombian-fugitive-living-

- 26 -

## ANALYSIS

Acosta attacks the decisions below from almost every conceivable angle. We start with his accusations of judicial bias levied against the IJ, then tackle removability. After that, we consider the Agency's wholesale denial of the relief Acosta sought. We close by addressing his motion to reopen.

To begin, though, two more table-setting points. First, in immigration cases, "judicial review typically focuses on the final decision of the BIA," but when the BIA affirms the IJ and "merely add[s] its gloss to the IJ's findings and conclusions, we treat the two decisions as one." Loja-Tene v. Barr, 975 F.3d 58, 60 (1st Cir. 2020) (cleaned up). That's often the case here.

Second, various standards of review apply to these various challenges. We'll address them as they arise, but some more shared vocabulary is necessary. We often review the Agency's factual findings under the "substantial evidence" standard. Caz v. Garland, 84 F.4th 22, 28 (1st Cir. 2023). That requires "any finding be supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (cleaned up). To reverse, we must determine "that the evidence must not only support the contrary finding, but compel it," meaning "that the evidence point[s] unerringly in the opposite direction." Id.

---

30-years-in-mass-deported-after-deadly-secret-
uncovered.html?outputType=amp [https://perma.cc/M7XG-965T].

- 27 -

(cleaned up).  Questions of law remain fresh for us to consider de novo.  <u>Leao</u> v. <u>Bondi</u>, 144 F.4th 43, 52 (1st Cir. 2025).

### Judicial Bias

Acosta first alleges that the IJ had it out for him during the proceedings, as evidenced by an acerbic tone as well as a hostile and disruptive approach towards him throughout.  "When asserting a claim of judicial bias," a petitioner "has the substantial burden of proving that the IJ showed a deep-seated favoritism or antagonism that would make fair judgment impossible."  <u>Ahmed</u> v. <u>Holder</u>, 765 F.3d 96, 103 (1st Cir. 2014) (cleaned up).  We review the BIA's denial of a bias claim de novo. <u>Id.</u>

Acosta opens his two-pronged judicial bias argument with plaints about the IJ's bellicose tone and demeanor.  His illustrative example is this exchange between Acosta's counsel ("AC") and the IJ, wherein Acosta's counsel twice sought clarification on which circuit's law the IJ deemed applicable to the proceedings:

> AC: Your Honor, if I may, there is another procedural matter that still has not been addressed by the Court since the last hearing.
>
> IJ: All right, what is that?
>
> AC: Which Circuit law are you applying in this case, Your Honor?  You had indicated that you were going to address that during the last hearing and that still has not been noted for the parties.

- 28 -

> IJ: Okay.  All right, we'll certainly note
> that at an appropriate time, but for now,
> let's continue with the evidence, but just for
> your edification, respondent's counsel, the
> Court is going to be using the Circuit law for
> the Circuit in which the Court is sitting
> which is the Fourth Circuit.[21]
>
> AC: Then I immediately move for you to recuse
> yourself, Your Honor, per [indiscernible]
> motion.
>
> IJ: I understand, yup, I understand.  I ruled
> on that before.  You filed a motion on it, I
> ruled on it.  So, let's please just move
> forward.  I understand.  You made the record
> and it's on the record.  Thank you very much.

According to Acosta, the IJ, presumably for no justifiable reason, delivered this decision "in an aggressive tone."

Undoubtedly, an immigration judge is charged with the responsibility of functioning as a neutral and impartial arbiter. Aguilar-Solís v. INS, 168 F.3d 565, 569 (1st Cir. 1999).  And failing to adhere to that responsibility can result in a removal proceeding that prevents a noncitizen "from reasonably presenting his case," thereby rising to the level of a due process violation. Jobe v. INS, 238 F.3d 96, 98 n.3 (1st Cir. 2001) (cleaned up); see also Muñoz-Monsalve v. Mukasey, 551 F.3d 1, 6 (1st Cir. 2008) (explaining how "fundamental fairness means in general terms that the [noncitizen] must have a meaningful opportunity to present

---

[21] We drop this footnote just to remind the reader that the BIA later reversed the IJ's course on this point.

evidence and be heard by an impartial judge").  But, at least from the cold record here, we do not espy a due process violation in this or any other exchange between the IJ and Acosta (and his counsel).  "Even if viewed through a jaundiced eye, the transcript reflects nothing more sinister than a modicum of impatience," if that.  Aguilar-Solís, 168 F.3d at 569.  What Acosta complains of about the IJ's demeanor and temperament "is not the stuff from which a due process violation can be fashioned."  Id.; see also Liteky v. United States, 510 U.S. 540, 555-56 (1994) (holding that charges of judicial bias and partiality cannot be established solely by "expressions of impatience, dissatisfaction, annoyance, and even anger").  We need say no more.

We turn now to Acosta's gripes about the IJ's trial practices, which he also says reflect judicial bias.  Acosta (citing forty-five pages of transcript without further specifics) complains that the IJ "repeatedly interjected" during his counsel's questioning of Jennyfer "even as counsel's efforts were repeatedly disrupted by interpretation and technological issues." He then says (and the exact language from his brief is important), "Despite these interruptions, the IJ imposed a time limit of ten minutes on [his] counsel's questioning -- restrictions that were not placed on the government attorney -- without accounting for the delays caused by technical difficulties" (emphasis ours).

After reviewing the record, we again see no error.[22] True, the record did include some instances of technical difficulties during Jennyfer's cross, but none appeared to be so consuming as to ruin the proceeding's propriety; they certainly did not deny us the chance to conduct "meaningful and effective appellate review" via the transcript, for instance. Kheireddine v. Gonzales, 427 F.3d 80, 84 (1st Cir. 2005).[23]

Likewise, the IJ's interjections don't constitute due process infirmities, either. The IJ occasionally asked Acosta's attorney to slow down for the interpreter. At other times, the IJ jumped in only to move along what he saw as improper questions (such as asking Jennyfer about other witnesses' declarations), clarifying unclear questions, and correcting misstatements of Jennyfer's testimony. And we also note that the IJ stopped the government's counsel from providing specific speaking objections to avoid prejudicing the witness (which was to Acosta's benefit).

In our evaluation of the proceedings' propriety, we keep in mind how the IJ "possesses broad (though not uncabined) discretion over the conduct of trial proceedings." Aguilar-Solís,

---

[22] We set aside the government's waiver-ish argument -- more precisely, that Acosta didn't adequately specify the interjections within the record -- because we ultimately agree with it on the merits.

[23] And although Acosta below pointed out one specific possible translation error arising from the technical difficulties, he doesn't really pursue it here.

168 F.3d at 568. And here, "the record reveals that the IJ interrupted only to clarify responses or to return strayed questioning to a relevant line of inquiry," as well as to correct attorney error on both sides. Id. at 569 (cleaned up). We think an IJ "who plays an active, but even-handed, role in keeping the focus of the inquiry sharp is to be commended, not condemned," and the IJ's conduct here fits the mold. Id.

A separate word on the purported "ten minutes" issue. We agree with the government: Acosta's characterization of what occurred is wrong; the IJ hardly "imposed a time limit of ten minutes" for cross-examination. After forty transcript pages' worth of perscrutation where (in the IJ's view) the line of questioning was getting repetitive, here's what happened:

> IJ: Counsel, before you continue, how much more of a cross -- how much more time do you need?
>
> AC: I've got three more pages of questions, Your Honor. There [are] a lot of things to go over for impeachment here.
>
> IJ: No, my question is just how much time do you need?
>
> AC: Probably at least another hour, maybe an hour and a half.
>
> IJ: All right, what you're going to do is you're going to ask the most relevant questions in the next ten minutes. Let's not go over the same questions several times. Let's just get out whatever you want to get out in cross[,] please do so.

> AC: I understand, Your Honor. I'm trying but she's being evasive in her answers and I'm doing my best.
>
> [Separate objection from the government's counsel]
>
> IJ: Counsel, next question please.

This is not the "ten minutes for cross" situation Acosta suggests in his brief. After sustaining several objections about the cross-examination's clarity and repetitiveness, the IJ had the discretion to move along the questioning: "A party to an immigration case, like any other litigant, is entitled to a full and fair hearing -- not an idyllic one." Id. (cleaned up).

Acosta next takes aim at the IJ's attitude on remand. More specifically, Acosta claims "the IJ was displeased" that, following the BIA's remand, he "had to redraft his decision" and he took his displeasure out on Acosta. Acosta's evidence? The IJ denied Acosta's attempts to submit new evidence and brief another venue and jurisdictional argument. Yet we again aren't convinced this was a reflection of judicial bias. The IJ clearly explained how he denied Acosta's requests because they weren't within the remand's scope, and that was (in our view) a reasonable interpretation of the remand order. So Acosta doesn't come close to showing how the IJ held "a deep-seated favoritism or antagonism that would make fair judgment impossible." Ahmed, 765 F.3d at 103 (cleaned up).

Lastly, Acosta says the BIA didn't hear him out correctly on appeal, accusing it of providing only a "perfunctory" statement of facts and not accommodating his request to listen to the recording of the proceedings as he wanted. He claims the BIA "deviate[d] from precedent" by affirming the IJ's "incomplete" decision, by "failing to conduct a de novo review of the application of fact to law," and by providing "no explanation of its decision in a way that allows for appellate review."

Yet the eight-page single-spaced BIA decision belies Acosta's characterization of its approach. The allegedly "perfunctory" BIA statement -- that the "record demonstrates the respondent received a full and fair hearing, and we do not find bias on this record" -- comes only after several pages of discussion of the record and his challenges. Nor, regarding the recording, does the BIA's decision indicate it didn't listen to the recording -- the decision doesn't say either way. And anyway, Acosta says he wanted the BIA to listen to the recording "to fully grasp the extent of the IJ's bias," but, as we've already explained, "expressions of impatience, dissatisfaction, annoyance, and even anger" cannot alone establish "bias or partiality." Liteky, 510 U.S. at 555-56. Beyond allusions to such expressions (that alone aren't sufficient to make out a claim), Acosta doesn't tell us what, specifically, in the recording bolsters his claim, so we don't see how the recording in this case has any more

- 34 -

evidentiary value than the transcript for sorting out his bias claim.[24]

And even if the BIA's determinations otherwise "deviate[d] from precedent" (again, Acosta's words), Acosta critically doesn't tell us which precedents it supposedly skirted, so we'll end the bias inquiry there.

### Removability

Acosta next gripes that the Agency erred in finding the government met its burden of showing Acosta was deportable by "clear and convincing evidence."[25]  8 U.S.C. § 1229a(c)(3).

Herein arises an interesting procedural quirk.  Acosta reminds us that the IJ made his initial removability determination on June 16, 2022, orally at a hearing.  That removability

---

[24] To be clear: we aren't saying that a recording could never help sustain a bias claim.  Acosta just doesn't tell us what's special about the recording in his case.

[25] One more vocab lesson: for removal proceedings purposes, the term "removable" (and variants like "removability") is actually an umbrella term that encompasses two distinct sets of noncitizens: (1) those who aren't already admitted to the United States, who are more specifically "inadmissible," and (2) those (like Acosta) who are already admitted to the United States, who are more specifically "deportable."  See 8 U.S.C. § 1229a(e)(2). The particular statute Acosta cites concerns the government's burden for demonstrating deportability of individuals who have been admitted to the United States, but doesn't concern individuals found removable due to inadmissibility.  See 8 U.S.C. § 1229a(c)(3).  That's all to explain: like Acosta and the government, we use "removable/removability" language throughout this discussion (and the broader opinion), but the more precise term (and thus the one that we use to bookend this section) is "deportable."

determination could, naturally, only be supported by evidence already in the record at that time. So Acosta says it was awfully odd -- indeed, reversible error -- for the IJ's May 2023 written removability decision to cite not only documents pre-dating the IJ's June 2022 removability determination, but to also reference evidence that got introduced during the separate and subsequent remedy phase of his proceedings (thus post-dating the June 2022 removability decision). More simply: because the IJ already decided removability in June 2022 at the hearing, Acosta contends the IJ shouldn't have relied on post-June 2022 evidence to support his written removability decision. But even in light of the procedural abnormality Acosta accurately identifies, we see no error warranting reversal, and here's why.

Recall that the IJ found Acosta removable on two different factual grounds: lying about his identity and failing to disclose past marriages. We review those findings under the usual rubric: substantial evidence for factual findings and de novo for legal questions. Urizar-Carrascoza v. Holder, 727 F.3d 27, 31 (1st Cir. 2013); Lima v. Holder, 758 F.3d 72, 78 (1st Cir. 2014).

#### Identity Determination

We start with the identity determination and address it with some dispatch. In his May 2023 written decision, the IJ identified several pieces of evidence sustaining the Department of

Homeland Security's allegations.[26]  Only Acosta's applications for

asylum and withholding of removal entered the record after the

June 2022 removability determination, so they are likely the only

evidence Acosta could procedurally be fretting about.[27]

That said, the transcripts hold the key.  After the

government presented evidence during the removability hearing,

Acosta's attorney explained, "[I]t is not in contention that

William Usma Acosta is his true and correct name and so we are

willing to concede" the identity allegation.  It has long been our

caselaw that a party "cannot concede an issue in the [lower] court

and later, on appeal, attempt to repudiate that concession and

resurrect the issue.   To hold otherwise would be to allow a

litigant to lead a trial court down a primrose path and later, on

appeal, profit from the invited error."   United States v.

Miranda-Carmona, 999 F.3d 762, 767 (1st Cir. 2021) (cleaned up).

---

[26] The cited evidence: a fingerprint analysis, Acosta's application for adjustment of status (where he said his name was Rendón, under penalty of perjury), his applications for asylum and withholding of removal (where he says his name is Acosta), and his statements during his hearing that he admitted he operated under an alias.

[27] As to Acosta's statements during the hearing, the IJ says Acosta "admitted to his use" of his alias, without a record cite. We aren't quite sure which moment this means: it could be the concession we're about to describe, or it could be his statement that his name was William Hernando Usma Acosta at the start of the hearing.  But both were in the record by the time the IJ made his removability determination and thus not covered by Acosta's timing argument.

So too here.[28]  See Urizar-Carrascoza, 727 F.3d at 32 (explaining that an IJ was entitled to rely on a petitioner's concessions in determining removability); Lima, 758 F.3d at 79 ("These rules hold true in the immigration context.").  Given Acosta's concession about his identity (and given he doesn't claim he ever explicitly withdrew that concession), we need not say more.

## Marriage Determination

Now we turn to the parallel evidentiary argument Acosta advances relative to the IJ's marriage determination.  Again, the IJ identified several pieces of evidence supporting the government's allegation that Acosta failed to disclose at least one past marriage.[29]  One such piece of evidence was Acosta's testimony, and that testimony did post-date the June 2022 removability determination.  Thus, by Acosta's telling, it is a piece of considered evidence that reversibly mars the legitimacy of the IJ's determination.

---

[28] We note that Acosta's concession came only after an initial denial of the same allegation, so the IJ was still right to note in his written decision that Acosta had initially denied this allegation.

[29] The cited evidence: Acosta's immigration applications, documents from Colombian courts, and his testimonial admission during his hearing that (as the IJ paraphrased in the May 2023 decision) "he did not want to be tied to a relationship with Laura (his true previous wife who he was convicted of murdering in Colombia)."

Here, the BIA's reasoning holds the key.  Setting aside how the IJ cited Acosta's later-in-time testimony, the BIA simply explained it did not "find error" in the IJ's determination that Acosta failed to disclose past marriages, because Acosta "signed the application containing misstatements and attested to its truth and accuracy."  In other words, in upholding the IJ's decision, the BIA did not rely upon the post-dated evidence Acosta asserts is tainted, but grounded its affirmance on properly admitted evidence.  And the BIA's conclusion (supported by documents in the record at the time of the IJ's initial removability holding) passes the substantial evidence standard applicable to removability determinations.  See Urizar-Carrascoza, 727 F.3d at 31.  With the BIA's correct conclusion (i.e., the signed applications sufficiently sustained the removability allegation that Acosta didn't disclose material facts about his marriage history) in hand, we have no reason to forge new ground in trying to disassemble any alleged impropriety of the IJ's reliance on evidence post-dating

his removability determination.[30]  Likewise, we see no other reason to question the marriage determination.[31]

All told, we see no reason from our lofty appellate perch to doubt the Agency's determination that the government established facts supporting deportability "by clear and convincing evidence."  8 U.S.C. § 1229a(c)(3); see Urizar-Carrascoza, 727 F.3d at 32.  So we soldier on.

---

[30] We are quick to note Acosta also fails to provide helpful authority for his novel procedural argument.  His cites to 8 U.S.C. § 1229a(c)(3), which just establishes the relevant burdens in removal proceedings, don't help.  Neither does Matter of Y-G-, 20 I. & N. Dec. 794, 796 (B.I.A. 1994), which says nothing about how to reckon with this complex timing issue.  Nor does Adeyanju adequately compare to (in Acosta's words) "the IJ in this case similarly rel[ying] on a clear misstatement of the facts as they unfolded in the proceeding," despite his best efforts to harmonize the two.  See generally 27 F.4th 25.  We decline to divine a new rule based on this hodgepodge of unilluminating authorities.  Cf. Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010).

[31] Acosta does offer two additional arguments: first, the government presented "no evidence" he married Sonia, and second, he actually offered documentary evidence to refute his marriage to Sonia that the Agency ignored.  But each is easily rebutted.

As to the first, Acosta neglects how he stated that Sonia was his past wife in his 2020 application for naturalization, despite previously stating he had no former wives in his 1998 application for adjustment of status.

As to the second, Acosta does not direct us towards the "documentation" he apparently submitted refuting the government's claim in his appellate brief.  So he "is asking us to do one of two things: accept what [he] says as gospel or mine the record ourselves to confirm the truth of [his] story." Rodríguez-Machado v. Shinseki, 700 F.3d 48, 49 (1st Cir. 2012).  But "there is no reason for us to do either," because "judges are not like pigs, hunting for truffles" in the record.  Id. at 49 (first quote); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) (second quote) (cleaned up).

## Asylum, Statutory Withholding of Removal, and CAT Withholding of Removal

Recall how Acosta sought several remedies to thwart his removal. The IJ denied them all, and the BIA affirmed that decision. Acosta naturally protests all those denials.

To kick off that multi-pronged protest, Acosta first attacks the Agency's determination that he couldn't receive asylum and withholding of removal (both under the INA and the CAT). The IJ denied those remedies because there were serious reasons to believe Acosta committed a serious nonpolitical crime -- a conclusion that in turn relied (at least in part) on the IJ's credibility determinations about Acosta, Hilandia, and Jennyfer. We start and end our analysis with the serious nonpolitical crime issue, which proves dispositive, while sprinkling in thoughts about Acosta's credibility arguments as needed.

Remember, the IJ determined there were "serious reasons for believing" that Acosta killed his wife and shot his daughter, a "serious nonpolitical crime."[32] Morgan, 120 F.4th at 924 (cleaned up). And the IJ's serious-nonpolitical-crime determination mattered insofar as it rendered Acosta statutorily ineligible for asylum and withholding of removal. See id.; see also 8 U.S.C.

---

[32] It's uncontested that a finding that Acosta murdered his wife and shot his child would legally constitute a "serious nonpolitical crime," so we just focus on whether the record supported the IJ's determination.

§§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii). We've equated the "serious reasons" standard to "probable cause," which itself means there's a "fair probability" Acosta did it; the standard "does not require either certainty or an unusually high degree of assurance." Morgan, 120 F.4th at 924-25 (cleaned up). If "the evidence indicates" the serious-nonpolitical-crime bar applies, it becomes Acosta's burden to prove, by a preponderance of the evidence, there aren't "serious reasons" to believe he committed a "serious nonpolitical crime." Id. at 926-27; see 8 C.F.R. § 1240.8(d).

The IJ cited the INTERPOL Red Notice, among other pieces of evidence, to support his determination. Acosta's main rejoinders are that such reliance on the INTERPOL Red Notice (1) was inappropriate and (2) lacked independent corroboration. But he has it wrong on both fronts.

We must first disagree with Acosta that it was "fundamentally flawed" for the IJ to rely in part on the INTERPOL Red Notice. The main case Acosta cites to support his argument -- Aguasvivas v. Pompeo, 984 F.3d 1047 (1st Cir. 2021) -- ironically shows why. There, the Dominican Republic tried to extradite Aguasvivas from the United States to prosecute him for a shooting, but we said the extradition notice didn't satisfy certain documentary requirements necessary for extradition under a treaty between the United States and the Dominican Republic. Id. at 1049, 1063. More specifically, the extradition

application included "no indictment or criminal complaint only because no complaint exist[ed] and apparently no indictment ha[d] even been sought," the point being the case concerned "a request to extradite for arrest and questioning in anticipation of a possible, yet-to-be-determined prosecution." Id. at 1058.

Acosta says the INTERPOL Red Notice is similarly inapt, but that can't be right. The extradition request in Aguasvivas predated even an indictment, while the INTERPOL Red Notice followed a criminal conviction in Colombia for murder. Id. There are naturally stronger grounds for the IJ to conclude there were serious reasons to think Acosta committed a serious nonpolitical crime. See Matter of W-E-R-B, 27 I. & N. Dec. 795, 799 (B.I.A. 2020). And while an INTERPOL Red Notice "is not a sufficient basis to arrest the subject of the notice because it does not meet the requirements for arrest under the [Fourth] Amendment to the Constitution," it isn't the only evidence the IJ cited. Hernandez Lara v. Barr, 962 F.3d 45, 48 n.3 (1st Cir. 2020) (cleaned up).

That leads right into Acosta's next argument. Apparently taking his cues from the ostrich -- famously (but incorrectly) believed to bury its head in the sand in the face of danger -- Acosta bafflingly insists there is "no credible

independent corroboration" of the allegations contained in the INTERPOL Red Notice.[33]  We see plenty.

For one, there's Jennyfer's testimony about the night of the shooting, which the IJ found credible (another decision Acosta attacks).  We analyze the IJ's credibility determination under the substantial evidence standard, Zaruma-Guaman v. Wilkinson, 988 F.3d 1, 5 (1st Cir. 2021), and to refresh, "the extent to which this standard is deferential bears emphasis: absent an error of law, we will reverse only if the record is such as to compel a reasonable factfinder to reach a contrary determination."  Id. (cleaned up).

In Acosta's words: while Acosta and Hilandia were "denied the benefit of the doubt" about inconsistencies in their testimony, Jennyfer was "readily afforded" some leeway in hers, purportedly "revealing an imbalance in how credibility [was] assessed."  For instance, Acosta says Jennyfer wasn't consistent about who was there on the night of the shooting and whether Laura had a gun that night.  He also says Jennyfer was confident on direct but unclear and contradictory on cross.

---

[33] The ostrich's head-burying is an "undeserved claim to fame," because ostriches don't really do that, but the image "persists" and "suits our purposes well," so we draw from it anyway.  United States v. Arroyo-Blas, 783 F.3d 361, 362 & n.1 (1st Cir. 2015).

Yet even if all that is right, it isn't enough to change the outcome. "Part of the IJ's function, qua factfinder, is to sift wheat from chaff and assess the persuasive force of explanations that are offered for apparent inconsistencies." Mashilingi v. Garland, 16 F.4th 971, 978 (1st Cir. 2021). And here, "the reasons given by the IJ for discounting" inconsistencies in Jennyfer's testimony -- such as her young age, her trauma, and her injuries sustained that night -- "are plausible and, thus, supported by substantial evidence." Id. That the IJ plausibly found Jennyfer more credible than Acosta and Hilandia is, thus, another decision we won't disturb.[34] See id. And Jennyfer's

---

[34] Here is as good a place as ever to address Acosta's other credibility arguments. The inconsistencies the IJ found important in Acosta's testimony (which we detailed above already) "were specifically identified, well-documented, hard as a group to reconcile or explain, and cumulatively persuasive of a lack of credibility," and thus the IJ's determination Acosta wasn't credible passes the substantial evidence test. Mashilingi, 16 F.4th at 978.

The same goes for Hilandia. We find the adverse credibility determination supportable on the merits for the reasons the IJ provided (more reasons that we already detailed above). See id.

And Acosta's arguments about the BIA's allegedly "superficial" reasoning aren't persuasive. Where the BIA "embraces the IJ's decision but adds its own gloss to the IJ's findings and conclusions, we treat the two decisions as one." Leao, 144 F.4th at 50 (cleaned up). So on this point, all the IJ's reasoning was incorporated into the BIA's decision, yet Acosta ignores most of it. See id.

Finally, Acosta's reliance on Matter of H-L-H- & Z-Y-Z-, 25 I. & N. Dec. 209, 212 (B.I.A. 2010), which he says grants the BIA the authority to "give different weight to the evidence" than the IJ, is misplaced. There, the BIA's authority to examine the facts

- 45 -

eyewitness/victim testimony describing the shooting amply supports the IJ's determination that there were serious reasons to believe Acosta killed Laura and shot Jennyfer.

Along with Jennyfer's testimony, more evidence supported the INTERPOL Red Notice: multiple affidavits from other witnesses to the shooting from Colombia, Colombian court documents, and perhaps most importantly, Acosta's several admissions during the hearing that he killed his wife and injured his daughter.[35]  To boot, the IJ also stated -- and Acosta does not contest -- that "the parties agree that [Acosta] shot the gun that killed his wife and injured his daughter on June 19, 1994 in Colombia."  And though Acosta argued it was "in self-defense" and he was "wrongfully convicted," the IJ specifically declined to relitigate Acosta's conduct from the ground up; the IJ instead leaned on the "serious reasons" standard -- and, more specifically, how it was Acosta's

_____

differently was for the specific "de novo review" of the legal question of "whether the facts are sufficient to establish that the respondent has a well-founded fear of persecution" as it relates to an asylum claim. Id. Such a legal analysis is distinct from the fundamentally fact-based credibility determinations undertaken by the IJ here. See Mashilingi, 16 F.4th at 977 ("An adverse credibility determination is, at bottom, a finding of fact . . . subject to review (in immigration proceedings) under the substantial evidence standard.").

[35]  Acosta says there is "no credible independent corroboration," but his own testimony corroborates the fact that he shot his wife and daughter. His choice of words on appeal would (if read literally) imply he, too, isn't credible. We note that irony only to illustrate further why we cannot buy his argument.

burden to show why there weren't serious reasons to believe he committed that crime, and how Acosta hadn't met that burden -- to end the discussion.[36]  The IJ correctly understood the analysis. See Morgan, 120 F.4th at 924.

And in ignoring all that evidence (except for offering gripes about credibility, some we've already rejected and others he doesn't develop), Acosta "fares no better here than we imagine our proverbial ostrich does when confronted by a predator in the wild."  United States v. Arroyo-Blas, 783 F.3d 361, 362 (1st Cir. 2015).  There is an abundance of "serious reasons" (including Acosta's own testimony) for believing that Acosta committed a "serious nonpolitical crime outside the United States."  Morgan, 120 F.4th at 924 (cleaned up).  We thus affirm the Agency's denial of asylum and withholding of removal under the INA and the CAT.

### CAT Deferral

Next, Acosta argues that the Agency erred in denying him CAT deferral because he failed to produce evidence that he'll be

---

[36] To refresh: the Agency can deny asylum and both statutory and CAT withholding if "there are serious reasons" for believing that the petitioner committed the crime, and we've past interpreted the "serious reasons" standard as equivalent to "probable cause," i.e., a "fair probability" Acosta committed such crimes. Morgan, 120 F.4th at 924-25 (cleaned up).  If "the evidence indicates" the serious-nonpolitical-crime bar applies, Acosta must show, by a preponderance of the evidence, why there aren't "serious reasons" to believe he committed a "serious nonpolitical crime."  Id. at 926-27; see 8 C.F.R. § 1240.8(d).

tortured in Colombia by (or at the acquiescence of) the Colombian government.[37]

We've previously explained how "applicants for CAT protection must make a two-part showing." Cabrera v. Garland, 100 F.4th 312, 324 (1st Cir. 2024) (cleaned up). First, they must show "it is more likely than not that they will be tortured if removed to a specific country." Id. (cleaned up). Second, they must show "that torture will be inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." Id. (cleaned up). Importantly, torture is (for CAT purposes) defined as:

> (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

DeCarvalho v. Garland, 18 F.4th 66, 72 (1st Cir. 2021) (cleaned up).

The standard of review on this analysis requires more explanation. "In assessing whether CAT relief is appropriate, an IJ makes findings of fact (e.g., whether a person is likely to

---

[37] Remember, because "the serious-nonpolitical-crime bar applies," Acosta's "only remaining remedy" under the CAT is deferral. Morgan, 120 F.4th at 927 (citing 8 C.F.R. § 208.17(a)).

suffer a particular harm and the role of the foreign government in causing or allowing that harm)." Id. at 73. But the IJ separately "determines how the law applies to those facts (e.g., whether such harm rises to the level of torture and whether the government's role renders the harm by or at the instigation of or with the consent or acquiescence of a public official)." Id. (cleaned up). The former is reviewed for clear error; the latter, de novo. Id.

Although Acosta had provided some country conditions about the state of human rights issues in Colombia, remember how the IJ denied him CAT relief because those "generalized" documents did "not corroborate" Acosta's testimony about the threat the cartel poses to him or the government turning a blind eye to that threat. And, as to the specific danger he faced, Acosta only included "unsubstantiated" Facebook comments from people that Acosta and Hilandia assert, "without support, are members of the cartel" (the IJ's words). From that, the IJ thought there was "no evidence" for Acosta's concerns about the Colombian government's acquiescence in the face of cartel-caused torture. The BIA affirmed, echoing the IJ's reasoning.

Now before us, Acosta makes four main arguments, but none persuade. First, Acosta says the Agency failed to consider "a documented death threat," namely a screenshot from a group chat of Jennyfer's family where one participant says, "Shoot [Acosta] and drop him in the river." Yet we think it's clear that the IJ

considered it, given his reference to "unsubstantiated comments" made by people whom Acosta claims, "without support, are members of the cartel." And anyway, this one remark by "Jairo Baena" (a figure who Acosta fails to identify) and the handful of other threats Acosta proffers don't move the needle about the likelihood of Acosta's harm for CAT purposes. Like the Agency, we see no connection between these comments and public officials who would act on them or yield to the cartel's attempt to do the same, and Acosta doesn't offer one. Cf. Ang v. Gonzales, 430 F.3d 50, 59 (1st Cir. 2005) ("The broadcasted death threat does not satisfy the definition of torture because the IJ supportably attributed that threat to a disgruntled ex-employee and not to a public official."). So this is a "clear error" question where we can't find the clear error. See DeCarvalho, 18 F.4th at 74 ("This determination about the likelihood that harm would befall DeCarvalho upon his return was a finding of fact, not a legal conclusion as to whether any such harm would qualify as torture.").

Second, Acosta fears "arbitrary arrest" and even "extrajudicial[] killing" in Colombia. To support that concern, he cites his own affidavit, his police report from 1994, and two news articles from 2022, one describing him as a "fugitive wanted for murder in Colombia" who was found in Belmont "after 27 years on the run." But nothing there credibly substantiates the "extrajudicial killing" concern. See Zheng v. Mukasey, 546 F.3d

- 50 -

70, 72 (1st Cir. 2008) ("Absent substantiation, self serving affidavits from petitioner . . . are of limited evidentiary value."). And given how a criminal court in Colombia found Acosta guilty of murder, we don't see why his arrest would be "arbitrary," even if it surely would not be desirable for him.

Third, Acosta points to several documents about Colombia (the 2021 Country Report, the 1993 Human Rights Watch Report, and the 1996 Country Report) to say that the government "targets people like him," without explaining what constitutes the group of "people like him." But these country reports do not "supplant the need for particularized evidence," and Acosta hasn't shown us how "he, personally, faces a risk of torture." Urias-Orellana v. Garland, 121 F.4th 327, 338 (1st Cir. 2024) (cleaned up). Put differently, that there are "credible reports of torture, abuse, and other mistreatment" in Colombia is not enough; indeed, it's "a far cry from showing that" Acosta himself "is a likely target" of governmental misconduct or negligence. Escobar v. Holder, 698 F.3d 36, 39-40 (1st Cir. 2012).

Fourth, Acosta laments that the Agency misapprehended the record by saying the Colombian government lacks knowledge of his "circumstances." But Acosta -- despite quoting the BIA's decision in his brief -- himself misapprehends what the BIA said: "the record does not demonstrate specific intent on the part of the Colombian government to cause severe pain and suffering." On

this central point, we agree with the BIA. Our "own careful review of the record didn't turn up anything that would suggest the agency's determination wasn't supported by substantial evidence." Cabrera, 100 F.4th at 325. And that the Colombian government knows about Acosta's "circumstances" (again, whatever he means by that term) is not enough; he's got to show, essentially, that the government's got it out for him for the wrong reasons and would look right past (i.e., acquiesce to) efforts to torture him. See Escobar, 698 F.3d at 39-40. His non-specific country reports and handful of threatening texts don't accomplish that. "Without such particularized evidence, and reviewing for substantial record evidence, we cannot say that the BIA erred in denying" Acosta "CAT protection." Cabrera, 100 F.4th at 325 (collecting similar cases). So we continue.

## Waiver of Inadmissibility

Acosta also sought a waiver of inadmissibility under 8 U.S.C. § 1227(a)(1)(H), but the Agency denied it.

We'll remind the reader how this went down. The IJ looked past the prerequisites found in the statute because he would "nevertheless deny" Acosta's "application for a waiver based on a discretionary determination." In other words, he weighed the equities to figure out whether Acosta deserved a waiver of inadmissibility. Favoring Acosta were his family ties to the United States (his wife and Carlos), the potential hardship they'd

- 52 -

face if Acosta were removed, as well as the letters of support the community sent on his behalf. But weighing against him were his decades-long use of a "stolen Colombian identity" in the United States and all the misrepresentations (some criminal) that came from it; likewise, Acosta was convicted of murder in Colombia and had evaded punishment for decades. All told, the IJ didn't think the waiver was an appropriate use of his discretion.

Acosta now protests that decision. As he concedes, though, there's a jurisdictional-sized obstacle sitting between us and any meaningful review. Indeed, we have held that 8 U.S.C. § 1252(a)(2)(B)(ii) strips us of jurisdiction to review discretionary decisions about waivers of inadmissibility. See Zajanckauskas v. Holder, 611 F.3d 87, 89-90 (1st Cir. 2010). And "while some discretionary determinations do present underlying, reviewable questions of law," a discretionary denial based on a balancing of the equities is not one such question. Id. at 90 (cleaned up). Instead, the factual circumstances undergirding a discretionary denial and the broader decision to waive eligibility are "within the IJ's discretion, and as such, we are powerless to review them." Id.

To try to overcome that jurisdictional dilemma, Acosta cites Patel v. Garland, 596 U.S. 328 (2022). There, he says, the Supreme Court recognized that "factual errors . . . fall outside the scope of unreviewable discretionary judgments" (his words, not

- 53 -

quoting from the case).  But there are a couple big problems with his read of Patel.  For one, Patel was about § 1252(a)(2)(B)(i), and not about § 1252(a)(2)(B)(ii) -- the relevant part of the statute for our purposes -- and that difference could matter given Patel's focus on the text.  See Patel, 596 U.S. at 337 ("The outcome of this case largely turns on the scope of the word 'judgment' . . . .").

Either way, the Supreme Court in Patel said the exact opposite of what Acosta says it said: the jurisdiction-stripping statute "encompasses not just 'the granting of relief' but also any judgment relating to the granting of relief.  That plainly includes factual findings."[38]  Id. at 339; see also id. at 347 ("Federal courts lack jurisdiction to review facts found as part of discretionary-relief proceedings under § 1255 and the other provisions enumerated in § 1252(a)(2)(B)(i).").  The dissent understood the decision the same way.  Id. at 354-55 (Gorsuch, J.,

---

[38] A word on the potential confusion.  Acosta cites "Patel, 142 S. Ct. at 1622" for the proposition that the Court distinguished between discretionary determinations and factual findings.  But at 142 S. Ct. at 1622, the Court just summarizes the government's argument (one the Court later rejected) that does try to distinguish between discretionary determinations and factual findings.  See Patel, 596 U.S. at 337-38 ("The Government classifies the factual findings at issue in this case -- the Immigration Judge's conclusions that Patel's testimony was not credible and that he had lied on the form -- as nondiscretionary and therefore outside the jurisdictional bar.").  Perhaps Acosta mistook this page of the case as the holding, causing him to interpret the case so differently than we do -- a cautionary tale to read cases carefully.

dissenting) ("On [the majority's] account, the statute denies courts the power to correct all agency decisions with respect to an adjustment-of-status application under § 1255 -- both the agency's step-one eligibility decisions and its step-two discretionary decisions," so now "no court may correct even the agency's most egregious factual mistakes about an individual's statutory eligibility for relief."). So, setting aside how the decision concerns a different part of the statute, we don't see Patel as displacing our Zajanckauskas holding by any means.

One last point: though the statute preserves our review of constitutional claims and questions of law, Acosta's arguments -- aside from his already-rejected bias plaints -- don't qualify as such. See Patel, 596 U.S. at 339; Zajanckauskas, 611 F.3d at 90. We have no jurisdiction to evaluate the IJ's discretionary denial of a waiver of inadmissibility. Zajanckauskas, 611 F.3d at 90. We won't say more.

## Cancellation of Removal

Acosta also argues that the Agency erred in denying him cancellation of removal under 8 U.S.C. § 1229b(a).[39] It did so based on the same balancing of the equities we described above. And the same fate awaits this part of Acosta's appeal. The INA

---

[39] Acosta's brief blends the "waiver of inadmissibility" and "cancellation of removal" arguments, but given their separate spots in the statutory structure, we split the discussion into two for clarity.

establishes that we lack jurisdiction to review "any judgment regarding the granting of relief under . . . [§] 1229b," the cancellation of removal part of the statute. 8 U.S.C. § 1252(a)(2)(B)(i). Aside from the judicial bias claim we've already rejected, we see no constitutional or legal (as distinct from factual or discretionary) arguments from Acosta on this point. We thus lack the jurisdiction to evaluate this exercise of discretion, too. See id.; Patel, 596 U.S. at 347.

## Motion to Reopen

Finally, Acosta argues that the Agency erred in denying his motion to reopen the case. These motions "are disfavored because of the threat they pose to finality." Perera v. Holder, 750 F.3d 25, 28 (1st Cir. 2014) (cleaned up). So the Agency has "a fair degree of latitude in deciding whether to grant or deny such motions," and we review that decision only for abuse of discretion. Id. In other words, the Agency's decision will stand unless Acosta shows the Agency "committed an error of law or exercised its judgment in an arbitrary, capricious, or irrational way." Id. (cleaned up). To be sure, this is a "highly deferential" standard of review, though importantly "not a toothless one." Id. (cleaned up).

Acosta says his sisters' new affidavit -- clarifying that they were hesitant to testify because of their safety and providing more details about the shooting of Laura and Jennyfer

and the threats Acosta faces upon his return to Colombia -- should have been enough to reopen the case.

But we start and end the analysis with a point Acosta almost entirely ignores: the requirement that the new evidence must be "material."  See Perez v. Holder, 740 F.3d 57, 62-63 (1st Cir. 2014) (stopping the analysis after upholding the BIA's ruling that the petitioner "had not introduced new, material evidence").  Evidence isn't material "unless it has some impact on the outcome of a petitioner's underlying case."  Id. at 62.

Both the IJ and the BIA found that the sisters' affidavit would not change the case's outcome.  Before us, Acosta only says that the Agency fails to recognize "the true significance of this new evidence" (his words) -- but importantly, he says that without himself explaining what the significance is.  Failing to challenge the Agency's reasoning about materiality -- a prerequisite for a motion to reopen -- could alone leave us "no choice but to affirm." Cf. United States v. Robertson, 162 F.4th 209, 246 (1st Cir. 2025) (cleaned up).

But even looking past that oversight, we -- like the BIA and the IJ before us -- cannot discern the affidavit's materiality.  See Perez, 740 F.3d at 63 (explaining how evidence isn't material if it does "nothing to fill a gap that existed in the original record evidence").  His sisters did not witness the shooting, and as the IJ explained, their affidavit actually

contradicts Acosta's recollection on some points, so it can't bolster his credibility.[40]  Likewise, their smears of Jennyfer lack much probative value.  See Zheng, 546 F.3d at 72.  And while we certainly can appreciate the fear Acosta's two sisters have for their brother's safety, that alone cannot move the needle.  See id.  So we see no abuse of discretion in the denial of the motion to reopen.[41]

**CONCLUSION**

For all those reasons, we **deny** the parts of Acosta's petition concerning judicial bias, removability, asylum, statutory withholding of removal, CAT withholding and deferral of removal, and the motion to reopen.  We **dismiss** the remainder (about waiver of inadmissibility and cancellation of removal) for lack of jurisdiction.

---

[40] Remember, the sisters' affidavit said that, on the night of the shooting, Acosta came to their mother's home with Cristian, didn't say anything (except for telling one of the sisters to take care of Cristian), and left Cristian there, while Acosta's affidavit describes a conversation with his mother and his retrieval of a revolver.

[41] We thus decline to entertain Acosta's gripes about the Agency's characterization of his sisters' previous statements as "vague," among other issues.